SMITH, PEAK *v.* STATE OF INDIANA.

[No. 29,643.  Filed December 16, 1960.  Rehearing denied
February 3, 1961.]

312

*Frank I. Hamilton*, of Greensburg, for appellants.

*Edwin K. Steers*, Attorney General, and *Carl M. Franceschini*, of counsel, of La Porte, for appellee.

LANDIS, J.—Appellants were charged by indictment with conspiracy to commit a felony, to-wit: the embezzlement of public funds. They were convicted after a trial by jury. Appellants Smith and Peak were fined in the amounts of five thousand dollars ($5,000) and two thousand five hundred dollars ($2,500) respectively, and they were each sentenced for a term of 2-14 years. They appeal from the judgment.

Appellants first contend the court erred in overruling their motion to quash the indictment alleging the facts stated in the indictment did not constitute a public offense.

The indictment in question was as follows:

"The Grand Jury for the County of Marion in the State of Indiana, upon their oath do present that VIRGIL W. SMITH, NILE TEVERBAUGH, ROBERT A. PEAK and HARRY DOGGETT on or about the 22nd day of September A.D. 1954, at and in the County of Marion and in the State of Indiana, did then and there unlawfully, knowingly and feloniously unite, combine, conspire, confederate and agree to and with each other for the object and purpose and with the unlawful and felonious intent to commit a felony, to-wit: embezzlement of public funds, in that the said VIRGIL W. SMITH who was then and there Chairman of the State Highway Department of Indiana, and, as such Chairman was charged and entrusted by law with the safekeeping, transfer and disbursement of money or funds belonging to or under the control of the State of Indiana or any state officer and as such Chairman of the State Highway Department of Indiana, the said VIRGIL W. SMITH would then and there unlawfully, feloniously and wilfully embezzle, convert and appropriate to the use of Robert A. Peak and Lawrence A. Peak a portion

of such money and funds, to-wit: twenty-five thousand eight hundred ($25,800.00) dollars in lawful money belonging to the State of Indiana, then and there being contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Indiana."

Appellants state that appellant Smith is alleged in the indictment to be charged and entrusted by law as Chairman of the State Highway Department with the safekeeping, transfer and disbursement of money in the state highway fund. Appellants contend this power and authority was reposed in the three-man State Highway Department, and that although appellant Smith was one of them, as chairman he did not have that authority.

Burns' §36-109 (1949 Replacement),[1] provides as follows:

"Bids—Orders—Vouchers.—The state highway commission shall have access to and the power to draw upon and expend all money in the state highway fund for the accomplishment and carrying out of the purposes of this act. Under the authority of the state highway commission and in conformity to its orders, the chairman shall approve all bids, sign all vouchers, issue all orders for supplies and materials, sign all contracts and agreements in the name of the state of Indiana, and shall subscribe to all other matters which may arise in the carrying out of the intent and purpose of this act."

The membership of the highway commission is constituted as provided by Burns' §36-173b (1960 Cum. Supp.) :[2]

"State highway department created—Members —Appointment—Term—Districts.—There is hereby created the state highway department of Indiana

1. Acts 1933, ch. 18, §9, p. 67.
2. Acts 1953, ch. 225, §2, p. 816.

which shall consist of three [3] members who shall be appointed by the governor for a term of four [4] years, subject to removal by the governor for cause. The governor shall designate a chairman from the three [3] members appointed. . . ."

Appellants contend that Burns' §36-109, *supra*, stating that the ". . . *commission* shall have access to and the power to draw upon and expend all money in the state highway fund . . ." means that the chairman thereof did not have the authority set forth in the indictment; on the other hand, appellee (the State) contends the chairman had control of the funds of the department under that portion of Burns' §36-109, *supra*, stating ". . . the chairman shall approve all bids, sign all vouchers, issue all orders for supplies and materials, sign all contracts and agreements in the name of the state of Indiana, and shall subscribe to all other matters which may arise in the carrying out of the intent and purpose of this act."

We do not believe the case of *State* v. *Roberts* (1948), 226 Ind. 106, 76 N. E. 2d 832, 78 N. E. 2d 440, relied on by appellants is in point as to the authority of the chairman of the commission. That case was an action for writ of prohibition in this Court to stop ditch proceedings by the lower court against the highway commission. It does not involve the question of the power and authority of the chairman of the commission as distinguished from the commission itself and is therefore not helpful to appellants.

Under Burns' §36-173b, *supra*, there can be no question that the chairman of the highway department is also one of the three members of the department. And under Burns' §36-109, *supra*, the chairman has authority to ". . . approve all bids, sign all vouchers, . . . [and] subscribe to all other matters which may arise

in the carrying out of the intent and purpose of this act." The department under Burns' §36-109 is given access to and the power to draw upon and expend all money in the state highway fund to carry out the purposes of the act.

We are unable to agree with appellants that appellant Smith as chairman of the department did not have sufficient authority over the safekeeping, transfer and disbursement of money in the state highway fund for the indictment to prevail over appellants' motion to quash. See also: *Kops* v. *State* (1942), 220 Ind. 373, 42 N. E. 2d 58.

Appellants further assert their motion to quash the indictment was erroneously overruled as the indictment in part states that appellants did ". . . on or about . . . unlawfully, . . . conspire, confederate and agree . . . to commit a felony, to-wit: embezzlement of public funds, . . . that . . . VIRGIL W. SMITH *would* then and there unlawfully, feloniously and wilfully embezzle, . . . a portion of said money and funds, to-wit: twenty-five thousand eight hundred ($25,800.00) dollars. . . ." (Italics supplied.)

Appellants contend the word "would" in describing the felony appellants allegedly conspired to commit, is improper as it relates to the future and that appellants should have been charged with conspiring to commit a felony, to-wit: that Virgil Smith *did* (instead of would) embezzle public funds.

To state the contention made by appellants is equivalent to admitting its absurdity, for it is obvious one could not be charged with having conspired to do something he had done prior to the conspiracy. The indictment charged conspiracy *to commit* a felony which of necessity relates to a conspiracy to commit a subsequent felony. The gravamen of the

crime of conspiracy has taken place when the unlawful agreement and conspiracy has been entered into regardless of whether the felony is actually committed or not. See: *Taylor, Bryant* v. *State* (1956), 235 Ind. 126, 131 N. E. 2d 297; *Lynn* v. *State* (1934), 207 Ind. 393, 193 N. E. 380. Furthermore, an affidavit similar to the indictment in the case before us was held sufficient as against a motion to quash in *Kops* v. *State, supra.*

Appellants have further contended the indictment should have been quashed as it is inconsistent with the facts, in that Virgil W. Smith is charged with having been ". . . then and there Chairman of the State Highway Department of Indiana . . ." when in fact they claim he did not become chairman until a later time. While this argument might properly have been urged as to the sufficiency of the evidence to sustain the verdict or upon the question of a variance between the indictment and the proof, it could not be a proper basis for quashing the indictment, for it is well settled that the facts alleged in the indictment are deemed to be true for the purpose of the ruling on the motion to quash. See: *Stephenson* v. *State* (1933), 205 Ind. 141, 179 N. E. 633, 186 N. E. 293.

We are unable to conclude any error was committed in overruling the motion to quash on the ground that the facts alleged did not constitute a public offense or that the offense was not charged with sufficient certainty.

Appellants further contend the court erred in overruling their motion for a mistrial and withdrawal of submission from the jury grounded on alleged remarks made by the prosecuting attorney outside the courtroom to the newspapers as to appellants' connection with other cases pending in court.

However, the motion does not set forth the alleged statements made by the prosecutor either in substance or in haec verba. Where error is predicated on the over-ruling of a motion for mistrial on the ground of misconduct of counsel, it is not sufficient to allege the misconduct in general language but the specific acts of misconduct must be set out. 4 Works' Ind. Prac., Lowe's Rev., §61.54, p. 51.

The motion does make reference to an article in the Indianapolis Star of October 26, 1957, but a search of the record fails to reveal the existence of any such exhibit in the transcript or the gist of the same in appellants' briefs, and there is therefore nothing before us for consideration. See: Rule 2-17 of the Supreme Court; *Board of Med. Regist. and Exam., etc.* v. *Bowman* (1958), 238 Ind. 532, 150 N. E. 2d 883; *Gilkison et al.* v. *Darlington* (1952), 123 Ind. App. 28, 106 N. E. 2d 473.

Appellants' next contention of error is that the court erred in overruling their motion for a mistrial based on the fact a newspaperman had talked to a juror at an intermission during the trial. The court held a hearing on the matter from which it appeared that one of the reporters was walking down the hall when a juror grabbed him by the sleeve and asked him what kind of a camera was being used. The reporter replied it was a panoramic and walked on, saying he couldn't talk to the juror. No showing was made by appellants to indicate how this conversation could have been prejudicial to appellants or denied them a fair trial, and as it appears to have been completely innocuous as far as the case at bar is concerned, we cannot say the trial court abused its discretion in overruling the motion for a mistrial.

Appellants next attempt to urge specifications 1-20 and 35-38 of their motion for new trial, but they fail to set forth the content of such specifications and refer to them by number only. The questions, objections, rulings, and answers to the questions which are the basis of these specifications do not appear in appellants' brief in the argument portion or under the condensed recital of the evidence. Nor is there any reference in appellants' brief to the page and line of the transcript where the evidence and rulings are to be found. No question is therefore presented. Rule 2-17, Indiana Supreme Court; *Sinks, Taylor* v. *State* (1956), 235 Ind. 484, 133 N. E. 2d 563.

Appellants have contended that the court erred in the overruling of appellants' motion in arrest of judgment, but the questions here raised are substantially the same as raised on the motion to quash which have heretofore been considered, and therefore no further question is here presented. See: *State* v. *Kimener* (1956), 235 Ind. 191, 132 N. E. 2d 264.

Appellants further urge specifications of their motions for new trial setting up that the verdicts were not sustained by sufficient evidence and that the court erred in overruling their motion to direct verdicts of not guilty. Appellants assert these specifications raise substantially the same question, and have grouped and considered them together in the same argument, and we shall so consider them. Appellants' contention here is limited to the assertion that only evidence as to mere associations between the parties was introduced before the jury, and that there was no design, purpose or any other essential facts presented which would support a charge of conspiracy to commit a felony.

The evidence favorable to the State shows that the two appellants in this case who are alleged to have

conspired together came from the town of Milan in southern Indiana; that appellant Smith, Chairman of the State Highway Department, also had an insurance business, and had written the fire insurance on Peak's home; that Peak, an attorney, had done some legal work for Smith and that they were business associates together in a finance company. Evidence was introduced to show that Nile Teverbaugh, director of the right of way purchasing division of the State Highway Department, obtained deeds on or about December 1, 1954, from Mr. and Mrs. Quinlan and Mr. and Mrs. Acker for two backlots on Madison Avenue in the city of Indianapolis along which an expressway was being built. That a total purchase price of two thousand five hundred dollars ($2,500) was paid by Teverbaugh to the Quinlans and Ackers for the backlots, the Ackers being paid by Teverbaugh giving them a one thousand dollar ($1,000) bill. The deeds did not convey the property to the State of Indiana but to one Dean Burton, who was Teverbaugh's small grandson, aged five years. Appellant Smith, who was Chairman of the State Highway Department, asked Teverbaugh three or four times about giving the Quinlan and Acker lot deeds to him (Smith), and Teverbaugh then handed over to Smith the deeds conveying the lots to Burton, for which Smith paid Teverbaugh three thousand dollars ($3,000).

Appellant Smith thereafter signed Dean Burton's name to a deed purporting to convey the lots to Peak's parents, Mr. and Mrs. Lawrence Peak. The deed was notarized by appellant Peak as to Dean Burton's signature although the evidence showed appellant Smith in fact signed the deed for Dean Burton, the minor. The parents of Peak, shortly after they received the deed, were called by the highway department and told that the highway department desired the lots sold to

the State, and on September 22, 1955, they conveyed the lots to the State for twenty-five thousand eight hundred dollars ($25,800), and appellant Smith as chairman of the highway department approved the sale in such amount ($25,800). Appellant Peak received three thousand dollars ($3,000) of this money from his parents in cash, and on October 6, 1955, he was given a personal check from them in the amount of nineteen thousand eight hundred dollars ($19,800).

. After the investigation of the Madison Avenue backlots was undertaken and appellant Peak had been interrogated several times by a newspaper reporter, Peak stated his parents didn't want any money that might be improperly acquired, and asked the reporter if he would turn it over to the state officials. Peak obtained a bank draft in the amount of twenty-two thousand eight hundred ($22,800), and mailed it to the reporter who turned it over to the Attorney General.

. The law is well settled that the crime of conspiracy to commit a felony may have been committed although the particular felony concerning which the conspiracy arose was never in fact committed. See: *Taylor, Bryant* v. *State, supra; Lynn* v. *State, supra.*

Evidence showing mere relationship or association between the parties or evidence merely establishing a suspicion of guilt will not sustain a conviction. *Mattingly* v. *State* (1957), 237 Ind. 326, 339, 145 N. E. 2d 650. However, proof of the existence of a conspiracy need not rest solely upon words giving rise to an agreement but may be inferred from the acts and conduct of the persons accused, done in pursuance of an apparently criminal or unlawful purpose in common between them. *Steffler* v. *State* (1952), 230 Ind. 557, 564, 104 N. E. 2d 729; *Brewster* v. *State*

(1917), 186 Ind. 369, 372, 115 N. E. 54; *Booher* v. *State* (1926), 198 Ind. 315, 322, 153 N. E. 497.

It is our opinion that the foregoing evidence with all inferences bearing thereon favorable to the State was sufficient to sustain the verdict of the jury convicting appellants of conspiracy to embezzle public funds, and further that the court did not err in overruling the motion to instruct the jury to find for appellants.

Appellants' final contention is that the court erred in refusing to grant a new trial on the ground of the alleged improper separation of the jury after it had begun deliberations, and for the alleged improper seating of the alternate juror for a juror who was dismissed because of illness.

Here it appears that after the arguments of counsel and instructions by the court, the jury retired for deliberations and shortly thereafter went to Charley's Restaurant in the city of Indianapolis for supper in the custody of bailiffs. The alternate juror also went to said restaurant, the regular jurors sitting at two tables together and the alternate juror at a third table with the two bailiffs. During the meal one of the jurors, the only woman juror on the regular panel, became seriously ill and was escorted outside the restaurant onto the sidewalk by two of the other jurors. One of the bailiffs went out also and noticed the woman juror was lying on the sidewalk ill, that she had vomited and fainted. The police and ambulance were called, but at the juror's request after regaining consciousness, a taxicab was also called. A policeman gave her first aid but she refused to go to a hospital and she was sent home in a taxicab. In the meantime the eleven remaining members of the regular panel and the alternate juror were taken back to the courthouse by a bailiff.

The judge, upon learning of the illness of the twelfth juror, ordered the alternate juror placed in the jury room to complete the panel. All this occurred out of the presence of appellants, and no formal order was entered by the court on its minutes until several hours later.

Shortly afterward, counsel for appellants appeared before the judge and the alternate juror was removed and the deliberations by the rest of the jury were halted until a hearing could be had on the objection and oral motion for mistrial made by appellants. After hearing evidence on the matter the court overruled the objection and the motion and ordered the alternate juror returned to the jury.

The statute relating to the selection of alternate jurors is Burns' §4-3325 (1946 Replacement),[3] which makes provision for the selection of alternate jurors not to exceed two, and provides alternate jurors shall be selected, subjected to challenge, sworn in, and required to conduct themselves in a like manner as the regular jurors. The act further provides that after retirement of the jury for deliberation the alternate jurors, if their services have not been required, shall remain in a convenient place designated by the court, subject to being discharged when the original jurors are discharged. It is further provided:

> ". . . If at any time, whether before or after the submission of the case to the jury, a member of the regular jury dies, or is discharged by the court by reason of illness or disability or disqualification to serve, the court shall not declare a mistrial, but shall order the alternate juror, if there is but one [1], to take his place with the jury. . . . After any such alternate juror is substituted, he shall be

3. Acts 1937, ch. 295, §1, p. 1347.

subject to the same rules as a regular juror and shall become a regular juror."

Appellants in their brief state they moved for a mistrial in the trial court on the grounds of (1) the unlawful separation of the jury after the cause had been submitted to the jury, and (2) because of the wrongful substitution of the alternate juror for a regular juror.

The record does not show any written motion for a mistrial bearing upon this matter, and as appellants' motion apparently was oral and did not state any grounds of record, we cannot know what contentions were asserted by appellants before the trial court.

However, from the unquestioned facts appearing of record, as heretofore recited, it is clear that the separation of the woman juror from the remaining jurors grew out of her sudden severe illness at the restaurant where the jury had gone for supper. Certainly when an emergency of this character occurred it could not be contended with reason that before the juror could be separated from the remainder of the jurors, she must, regardless of her physical condition, be taken back to the court room for the court to conduct a hearing in the presence of appellants. The statute does not expressly forbid the separation of a juror in all cases of emergency prior to the discharge of the juror by the court, and we should not construe the statute in a manner that would bring about an intolerable result and appear ridiculous. Under the circumstances we do not believe there was an unlawful or improper separation of the jury, and as no harm appears to have been caused to appellants, appellants have no cause to complain. See: *Badgley et al.* v. *State* (1949), 226 Ind. 665, 82 N. E. 2d 841.

As to appellants' contention that there was a wrongful substitution of the alternate juror for the regular

juror, it is our opinion that it was irregular for the court to order the alternate juror to go to the jury room before the regular juror was duly discharged by the court. However, in the case before us, upon objection by appellants a full hearing was had on this matter by the court, and as no prejudice was shown therein to appellants we are not able to say that reversible error was committed by the court in overruling appellants' objections and motion for mistrial and by then ordering the sick juror discharged and the alternate juror to join the remaining jurors in their deliberations in the case.

Finding no reversible error the judgment is affirmed.

Achor and Arterburn, JJ., concur.

Bobbitt, C. J., concurs in result.

Jackson, J., not participating.

NOTE.—Reported in 170 N. E. 2d 794.