## HUTCHESON v. STATE OF INDIANA.

[No. 30,081. Filed October 2, 1963.]

*Royse, Travis, O'Brien & Hendrickson,* of Indianapolis, for appellant.

*Edwin K. Steers,* Attorney Genral and *William D. Ruckelshaus,* Assistant Attorney General, for appellee.

LANDIS, J.—Appellant was indicted with Frank M. Chapman and O. William Blaier for conspiracy to commit a felony, viz: bribery of a state officer, to-wit, one Harry Doggett, assistant director of the right-of-way department of the State Highway Department of Indiana. Chapman and Blaier died pending the proceedings. Appellant was tried by jury and convicted and has appealed from the judgment.

Appellant contends on this appeal that the verdict was not sustained by sufficient evidence and specifically that the evidence was not sufficient to prove either conspiracy or bribery. Appellee (the State) on the other hand argues that there were sufficient facts from which the jury could have inferred appellant's guilt.

To determine this question it is necessary that we consider the evidence favorable to appellee which is substantially as follows:

Appellant and the other two defendants, Chapman and Blaier, were officers of the United Brotherhood of Carpenters and Joiners of America. In 1956 and 1957 Hutcheson was general president, Blaier was second general vice-president, and Chapman was general treasurer. Their offices were located in the city of Indianapolis, Indiana, at 222 East Michigan Street.

Harry Doggett, the person whom appellant and the other defendants were alleged to have conspired to bribe, was assistant director of the right-of-way department of the State Highway Department of the State of Indiana in the year 1956. Doggett resigned January 29, 1957. Doggett's general job was the supervision of all land purchases and appraisals.

On July 1, 1956, the State Highway Department opened an office in Lake County, Indiana, to facilitate the acquisition of land preparatory to the construction of the Tri-State Highway. Lewis B. Smith was placed in charge of the Gary office in Lake County. His immediate supervisor was Harry Doggett.

In June 1956, defendants Chapman and Blaier opened a special account in Chapman's name in an Indianapolis bank. Into this account, they each put $10,000 of their own money. In August and September of 1956, Chapman obtained personal bank loans of $20,000 by sign-

ing two notes. Appellant endorsed or co-signed both notes for Chapman. This money was used to purchase land in Lake and Wayne Counties. Said land, after the purchase by defendants, was bought by the State in right-of-way proceedings.

In June 1956, defendant Chapman went to Lake County and met a realtor in Gary named Urban Boehler. Boehler owned one lot on Braodway and said he knew where he could get at least one more. Boehler sold his lot for $1,000, and the two adjoining it for $1,500 each. He also sold him another lot for $5,000. This was the area through which the Tri-State Highway was going to go. It had been finally approved by the Commission May 31, 1956. In August of 1956, three lots were sold respectively, for $5,000, $5,000 and $18,166. The evidence is not clear as to what price Boehler's own lot was sold to the State. Chapman had told Boehler they were going to " . . . put up a building and materials supply. . . . "

On May 31, 1956, defendant Chapman met with Mr. Floyd K. Dungy, a real estate broker and contractor in Gary. Chapman said he was interested in some land in the Grant Street area. He told Mr. Dungy he was representing a group of Indianapolis businessmen who wanted to build a lumber yard there. Mr. Dungy sold Chapman the one lot he owned for $1,800, and said (Dungy) he had found seven other lots for him to buy. Chapman told Dungy to buy the other lots within the price range $1,300 to $1,500. Dungy later told Chapman he could not get all the lots within the $1,300 to $1,500 price range. Chapman said he would take this up with his associates, and he subsequently agreed to the higher price.

Chapman left several certified checks with a Donald Gardner, a real estate agent in Hammond, to pay the

grantors when the deeds came in. Chapman left Blaier's address as the one to be used by Gardner, since Chapman was going away on vacation.

The aforementioned Lewis Smith testified that the usual procedure followed in the purchase of land in Lake County, was for a packet to be prepared containing a description of the land to be acquired, the high and low appraisals, and a voucher with the grantor's signature on it. The packets were then sent to Indianapolis. The purchases were then accepted by the Commission, and sent back to Smith with the grantor's check attached. As soon as the title insurance was issued, Smith would turn the check over to the grantor.

There were nine (9) parcels of land called by Smith "the Chapman grants". These grants were treated differently then the other grants. The checks to the grantor, as to four (4) of these parcels, never came back through Smith's office. Also the agents attached to the Lake County office, did not negotiate with the grantor, Chapman, for any of these grants. As to the other five (5) checks, Smith was to send them to Indianapolis and deliver them to Harry Doggett at the order of Virgil Smith, chairman of the highway commission. Catherine Kiser, Lewis Smith's secretary, said the five (5) Chapman grants were sent to Indianapolis through Mr. Rust, a highway land agent, at the request of Harry Doggett. Harry Doggett asked Spiro Skaltsas, a lawyer, to hurry up and approve one of the Chapman grants, as Chapman was going to Europe.

Several of the right-of-way grants from Chapman, and the payments therefor, were approved by Harry Doggett, as assistant field director.

Mr. Donald Arthur testified that Chapman and Blaier visited him in Richmond, Indiana, August 29, 1956. They expressed a desire to purchase his farm in Wayne County. Arthur knew a highway was coming through his property, and he had offered his farm to a neighbor for $15,000. Blaier asked Arthur, in a hardware store in Richmond, what he wanted for his farm. Arthur said $16,500, and Blaier agreed. Blaier evinced no interest in seeing the farm when Arthur offered to show it to him, but they went out anyway. The appraisers had been there two or three weeks before Blaier and Chapman showed up; and Arthur had mentioned the same price to the appraisers. The proposition was signed the same day by Blaier and Mr. and Mrs. Arthur. Arthur was paid $1,500 on August 29th, and the balance on September 7th of $15,000 by Blaier and Chapman. Mrs. Arthur testified that when she and her husband were in the lawyer's office in regard to the transaction, Blaier and Chapman were told the highway was coming through there. They answered, "We will take care of that." The Arthur's land was sold to the State for $19,000 on December 13, 1956. Harry Doggett again approved this grant, as assistant field director.

One J. Vernon Cox, who was president of the Central Indiana District Council of Carpenters, testified he had a conversation with appellant about a project involving a highway in Marion County and an attempt to put some carpenters there to work. Mr. Hutcheson said he had a friend who had information on where the U. S. 40 cloverleaf and Geist Reservoir roads in Marion County were going.

It appears from State's exhibit 63 that a total of $102,581.70 was paid by the State for the nine (9) parcels of land deeded to the State by defendant Chap-

man for which Chapman had previously paid $22,900. It further appears from another exhibit that $113,653.50 was the high appraisal for such land, and $107,677.90 was the low appraisal for the land, and that it was sold to the State at $5,096.20 less than the low appraisal.

From the profit of $79,681.70 derived on the Lake County land deals, and $2,500 from the Wayne County property, Chapman paid off the bank loans of $20,000, returned to himself and Blaier their respective investments of $10,000, and paid from his special bank account $15,500 to himself, and to appellant Hutcheson $15,500; Blaier, $15,500; Doggett, $15,800; Virgil Smith, $15,800. The total profit to the above five (5) recipients was thus $78,100, and these payments were made in the latter part of 1956 and early 1957.

Metro Holovachka, the former prosecutor of Lake County, testified that the Lake County grand jury had investigated defendants, concerning the Tri-State Highway in the summer of 1957. A check was given Holovachka by a Lake County attorney to give to the attorney general of Indiana. The check was dated August 16, 1957. The check was made out to the State of Indiana for $74,581, and was signed by Frank Chapman.

It is of course true in cases of conspiracy that evidence showing mere relationship or association between the parties or evidence merely establishing a suspicion of guilt will not sustain a conviction. *Smith, Peak* v. *State* (1961), 241 Ind. 311, 322, 170 N. E. 2d 794, 800; *Mattingly* v. *State* (1957), 237 Ind. 326, 339, 145 N. E. 2d 650, 656.

Appellee concedes in its brief that the proof of an agreement or conspiracy in this case is dependent on

circumstantial evidence, but states that it is extremely strong here.

Appellee agrees with appellant that it might be inferred, as appellant suggests, that his co-signing of the bank notes for Chapman was done as a favor to a friend. However, appellee argues it would be more logical to infer from such an act of appellant coupled with his statement that he had a friend who knew where the roads were going, and his subsequent receipt of an equal share with Blaier and Chapman, that the three of them conspired to obtain these profits with a felonious purpose.

What does the record disclose as to the statement relied on by appellee that appellant had a friend who knew where the roads were going? The only evidence on this point is from witness J. Vernon Cox, president of the Central Indiana District Council of Carpenters, who testified for the State as follows:

"Q. Did you have a conversation wherein Mr. Hutcheson stated that he knew you were a member of the Real Estate Board?

"A. . . . I think it was common knowledge that I was a real estate broker. I was in the business about eight years.

"Q. Yes, I know, but you don't recall a conversation with Mr. Hutcheson with reference to that?

"A. No, I recall a conversation with Mr. Chapman specifically, and I believe, Mr. Blaier, but I don't recall any other.

"Q. Was that with reference to you being in the real estate business?

"A. Yes.

"Q. What was that conversation?

"A. The one that I spoke of being a possibility of *using land or buying land or moving houses in respect to our organizing program.* [Italics supplied.]

"Q. Was any reference made to State Highway lands?

"A. I don't know whether the road that we were thinking about was a State Highway or not. It run out towards Geist Reservoir. I think U. S. 40 cloverleaf is a State Highway, U. S. Highway, as a matter of fact.

"Q. Well, was any of this conversation with reference to the acquiring of any lands, and being near State Highways by the corporation?

"A. Only the two I mentioned.

"Q. Only the two you mentioned?

"A. Yes.

. . . . .

"Q. Now, Mr. Cox, during the early summer of 1956, did you have a conversation with Mr. Hutcheson with reference to plats and maps of State Highways?

. . . . .

"A. At the time I talked with Mr. Hutcheson he had a map. The location of the cloverleaf, I think, was on there, and there were other maps. He spoke of two locations where there were roads going to be built, and some houses that were going to be moved. And these are the two that I spoke of, cloverleaf on 40, and a road that goes toward Geist Reservoir.

"Q. Did he tell you where he got the maps and plats?

"A. No, he did not. He said he had a friend that had information on where these roads were going.

"Q. Mr. Cox, are you the same Mr. Cox who testified this morning?

"A. That is correct.

"Q. And I will ask you whether or not the facts which you have testified to occurred in Marion County, State of Indiana, within five years immediately prior to February the 18th, 1958?

"A. Yes."

The testimony of Cox related solely to two roads in or near Marion County, Indiana, and had nothing whatsoever to do with Lake or Wayne County real estate, the Tri-State Highway in Lake County or any state highway in Wayne County, Indiana. It further appears that Cox was interested in helping small contractors and in the possibility of a corporation and that he could handle the matter as he was a real estate broker. Cox related a conversation he had with appellant about a project involving a highway in Marion County and an attempt to put some carpenters there to work.

There is no intimation in the record or any suggesttion by appellee that its witness Cox had anything whatever to do with the transactions which allegedly took place in Lake or Wayne Counties. It is difficult to see how appellant's statement to Cox, about having a friend who had information on where the roads were going in Marion County, and which could as well have pertained to a plan to put carpenters to work, and thus have an altruistic purpose if any can be ascribed to it, can be considered as supporting the prosecution's case that appellant conspired with a felonious purpose to commit bribery to obtain the profits that were realized. There is no evidence that appellant, or for that matter that either of the defendants Chapman or Blaier, knew Doggett who was the official allegedly bribed. The receipt by appellant of an equal share of $15,500, together with a similar sum to Blaier and Chapman, is not necessarily of a blameworthy nature, as it might well have been merely a reward for the risking of his personal capital in an ordinary business venture.

It is true of course that Doggett, the highway official, received checks from defendant Chapman for $15,800. However, what the payment was for does

not appear from the evidence, and as we recently said in *McDonough* v. *State*[1], checks and vouchers without supporting evidence are frequently meaningless. Moreover, in oral argument it was conceded that Doggett himself had been acquitted of the offense of accepting a bribe.

Appellee argues in its brief that: "It makes no difference what Doggett did to deserve the money or even if he thought he was getting a bribe." Appellee then says: "The crucial question is whether defendants thought they were bribing Harry Doggett."

Of course, it is true as we stated in *Smith, Peak* v. *State* (1961), 241 Ind. 311, 322, 170 N. E. 2d 794, 800, *supra,* that the crime of conspiracy to commit a felony may have been committed although the particular felony concerning which the conspiracy arose was never in fact committed.

The trouble with the prosecution's case is, however, that while the evidence as to whether Doggett was bribed is weak, it is weaker still and entirely insufficient on the point of whether appellant agreed or conspired to bribe the said Doggett.

Appellee has characterized the case at bar as being strikingly similar to the evidence in *Smith, Peak* v. *State* (1961), *supra,* where we upheld a lower court's judgment convicting defendants of conspiracy to embezzle public funds.

However, in the *Smith, Peak* case, *supra,* it appeared from the evidence that the two defendants had actively participated in the conspiracy. In that case Nile Teverbaugh, director of right-of-way purchasing for the highway department, purchased for $2,500 two back

---

1. *McDonough* v. *State* (1962), 242 Ind. 376, 379, 175 N. E. 2d 418, 421.

lots on Madison Avenue where the expressway was being built. The deeds did not convey the property to the State of Indiana, but to Teverbaugh's five (5) year old grandson, Dean Burton. Upon the request of defendant Virgil Smith, chairman of the Indiana State Highway Department, Teverbaugh handed over to Smith the deeds made out to his grandson Burton, for which Smith paid Teverbaugh $3,000. Defendant Smith thereafter signed the five (5) year old Burton's name to a deed purporting to convey the lots to the parents of his co-defendant, Robert A. Peak. Peak notarized the deed as to Dean Burton's signature although the evidence showed the defendant Smith signed the deed for Dean Burton, the minor.

Shortly after the parents of Peak obtained the deed they were called by the highway department and were told the highway department desired the lots sold to the State and they were then conveyed to the State for $25,800, and defendant Smith as chairman of the highway department approved the sale. Defendant Peak received $22,800 of this money from his parents. The money was later turned over to the attorney general after an investigation by a newspaper reporter. There is no question but that such evidence supported a charge that Smith and Peak had conspired and agreed to commit a felony, to-wit: the embezzlement of public funds by Smith, as chairman of the highway department, by the said Smith embezzling and converting to the Peaks a portion of the money, to-wit: $25,800 belonging to the State of Indiana.

. In the case at bar the mosaics which appellee contends weave a web of guilt around the defendant require the building of inferences upon inferences, and are therefore in our judgment insufficient. The record is simply devoid of facts

and circumstances from which inferences can properly be drawn to establish that appellant entered into a conspiracy to bribe Doggett. As we have heretofore stated, evidence which at the most tends to establish a suspicion of guilt is not sufficient to sustain a conviction.

We must therefore conclude the verdict in this case was not sustained by sufficient evidence.

In view of the result we have reached it is not necessary to consider the remaining contentions of error asserted by appellant.

Judgment reversed with directions to sustain appellant's motion for new trial.

Myers, C. J., and Achor and Arterburn, JJ., concur; Jackson, J., not participating.

NOTE.—Reported in 192 N. E. 2d 748.