MATTINGLY *v.* STATE OF INDIANA.

[No. 29,492. Filed November 12, 1957.]

*DeRoo Weber,* of Mt. Vernon, and *Carrol F. Dillon,* of Evansville, for appellant.

*Edwin K. Steers,* Attorney General, *Owen S. Boling* and *Merl M. Wall,* Deputy Attorneys General, for appellee.

PER CURIAM.—Appellant was charged by affidavit with conspiring with his brother Wilson Mattingly and one William Ausley under Acts 1905, ch. 169, §641, p. 584, being §10-1101, Burns' 1956 Replacement, to commit a felony, to-wit: "to break and enter into Reed's Barbershop in Mount Vernon, Indiana, . . . to take, steal and carry away the goods, chattels and personal property of Jesse Reed . . . ."

He was separately tried by the court, without the intervention of a jury, found guilty as charged and sentenced to the Indiana Reformatory.

Two questions are presented for our consideration.

*First:* Appellee asserts that the evidence is not in the record because the only evidence at the trial of appellant was by stipulation of the parties that "the evidence in the trial of Wilson Mattingly should be taken and considered to be the evidence in the trial of Lawrence Mattingly . . . .", and such evidence was neither read into the record in the trial court, nor was

a transcript of the stipulated evidence introduced into evidence at the trial of appellant herein.

Appellant also attempts to raise substantially the same question. However, any omission or error which might have been made in the introduction of the stipulated evidence was waived by appellant because of his failure to raise the question in the trial court where the error, if any, might have been corrected.

There appears in the transcript of the record filed herein a Bill of Exceptions containing not only the stipulation hereinabove referred to, in full, but also a transcript of all the evidence given in the trial of State of Indiana v. Wilson Mattingly, duly certified to by the official court reporter.[1]

1.    "NO. 2359
"REPORTER'S CERTIFICATE ·
"I, Daisy M. Bryant, official shorthand reporter of the Posey Circuit Court, do hereby certify that I am the official shorthand court reporter of said court, duly appointed and sworn to report in shorthand the evidence of causes tried therein; and as such shorthand reporter, I took down in shorthand all of the evidence given during the trial of the State of Indiana vs. Lawrence Mattingly, which evidence consisted solely of a stipulation by counsel that the evidence received in the trial of the State of Indiana vs. Wilson Mattingly be stipulated as evidence in this cause, which stipulation is page 28 & 29 of the foregoing transcript and the transcript of the evidence presented in the case of State of Indiana vs. Wilson Mattingly which is pages 30 to 160 inclusively in the foregoing transcript.

"I further certify that I took down in shorthand all the evidence given in the trial of State of Indiana vs. Wilson Mattingly, the objections of counsel thereto, the rulings of the court upon such objections, the offer to prove, the objections thereto, the rulings of the court on such objections the motions to strike out, objections thereto, and rulings of the court thereon, upon such trial by the respective parties. I further certify that I have correctly transcribed my said notes of the evidence and proceedings, taken as aforesaid, and reduced the same to typewriting.

"I further certify that the foregoing transcript is a full, true, correct and complete copy, made by me, of the shorthand report of said evidence, objections thereto, rulings of the court thereon, and documentary evidence read in evidence, and that said typewritten transcript of said shorthand report of said evidence is a full, true and correct record of all of the evidence given upon the trial of said cause.

"WITNESS my hand this 26th day of October, 1956.
"/s/   DAISY M. BRYANT"

We think this is sufficient to bring the evidence before us, particularly in view of the fact that the record discloses that the trial court, the defendant-appellant, and the prosecuting attorney considered the evidence in the trial of Wilson Mattingly as the evidence in the trial of appellant herein. Both parties, having adopted this procedure without objection in the trial court, are bound by it on appeal here. *State ex rel. Cline* v. *Schricker* (1950), 228 Ind. 41, 45, 88 N. E. 2d 746; *Pokraka* v. *Lummus Co.* (1952), 230 Ind. 523, 527, 104 N. E. 2d 669; *Cf: State ex rel. Christopher* v. *Amrine* (1950), Ohio App., 94 N. E. 2d 204; *Landis* v. *New Amsterdam Cas. Co.* (1952), 347 Ill. App. 560, 107 N. E. 2d 187, 191; *McCann* v. *McCann* (1912), 20 Cal. App. 564, 129 Pac. 966, 967; *Gormley* v. *United States* (1948), 4 Cir., 167 F. 2d 454, 458.

*Second:* Appellant asserts that the decision of the trial court is not sustained by sufficient evidence.

To sustain a conviction in this case the State was required to prove, beyond a reasonable doubt, that appellant knowingly and unlawfully agreed and united with one or both of the other persons named in the affidavit to break into and enter Reed's Barber Shop in Mount Vernon, Indiana, with the intent to steal the personal property of Jesse Reed.

To determine whether the State has discharged this burden of proof we will examine only that evidence most favorable to the appellee. Such an examination discloses that the chief witness for the State was William Ausley, one of those charged in the affidavit with appellant, who testified in pertinent parts, on direct examination, that he knew appellant and Wilson Mattingly and was with them on

the night of May 8-9, 1956; that he first saw them "Around six o'clock" and got into appellant's car with them; that they stayed around town "until pretty late" and then drove out to Bufkin where he and Wilson broke into a store and took some money, cigars and cigarettes. This witness further testified that appellant was not with them when they broke into the store, and that the three of them had not talked about it before they reached the store; that appellant drove them to Bufkin but nothing was said; that after they stopped near the store they "talked about that store being there and nobody was living in the store," and he asked where the closest people lived, and "he said across the road and back down the road was a house"; that all three of them were talking there, but he and Wilson were the ones who broke into the store;[2] and that after this they returned to Mount Vernon where they met some girls whom they took to Evansville.

After taking the girls to Evansville and drinking a fifth of whisky they returned to Mount Vernon. As to what they did then, this witness testified as follows:

"A. We came into town, and we were going home. I guess we were pretty well excited, and feeling pretty good from the whisky, and we were talking about robbing something, and we discussed robbing the bank for awhile, and after we got on Second Street Wilson said he knew this boy in the barbershop, and they left money in there, and he said 'do you want to get it,' and we said we might as well.

"Q. All three were talking it over?

"A. Me and Wilson were talking it over.

2. The evidence concerning the breaking into of the store at Bufkin was objected to in the trial of Wilson Mattingly by his attorney and was admitted over such objection.

"Q.  And you agreed to go there?

"A.  I don't know, after Lawrence stopped his car at the V. F. W. he said 'what place are you going to rob' and I said, 'first place we come to.'

"Q.  But you had already talked about the barbershop before that, hadn't you?

"A.  Wilson and I had.

"Q.  And Lawrence said 'what place are you going into' and you said 'the first damn place we come to,' did you say that?

"A.  That is about what I said."

On cross-examination this witness testified:

"X. Q.  Did you give a reason for stopping the car down there at Second and Walnut?

"A.  We were talking about entering the place.

"X. Q.  What place?

"A.  Any place.

"X. Q.  Who did you have that conversation with?

"A.  I guess me and Wilson was talking among ourselves, and the radio was on—Lawrence might have heard it, I don't know whether he did or not.

 •    •    •    •

"X. Q.  And when you stopped down here on Second Street, what was the reason for that?

"A.  We were talking about going in any place, it didn't matter too much.

"X. Q.  You and Wilson did that?

"A.  Yes, sir, we were talking.

"X. Q.  Were you sitting in the front seat or back seat?

"A.  All three sitting in the front seat.

"X. Q.  And the radio was going full blast?

"A.  No, sir, it was on.

"X. Q.  You said you didn't know whether Lawrence heard you or not, would that be on account of the radio?

"A.     It might be, and it might have been because he was occupied by thinking of something else.

"X. Q.  Was he drunk?

"A.     I am not qualified to answer that.

"X. Q.  Were you intoxicated?

"A.     I had been drinking pretty heavy, sir.

"X. Q.  Was Wilson Mattingly intoxicated?

"A.     I can't answer that for you, sir, he was drinking.

"X. Q.  Did you stagger up the street, you and Wilson?

"A.     Yes, sir.

"X. Q.  Now according to your statement, I believe you said you were going to get the first one you came to, is that right?

"A.     We said we were going to rob the first place we came to.

"X. Q.  Did Lawrence Mattingly ask you where you were going when you got out of the car?

"A.     He yelled something to that effect.

"X. Q.  What did he say?

"A.     'What place are you going into?'

"X. Q.  None of the places of business were open at that time of morning, were they?

"A.     No, sir.

"X. Q.  From that statement there it appears he didn't know where you guys were going, is that right?

"A.     We had talked about the barbershop.

"X. Q.  You mean you and Wilson had?

"A.     Yes.

"X. Q.  He didn't know just where you were going?

"A.     No, sir, we didn't, at least I didn't.

"X. Q.  Did you know where you were going when you got out of the car?

"A.    No, Wilson came back there and started to open the window up and I was helping. When I got to that window I made up my mind.

"X. Q.    When you got out of the car and went across Walnut Street you didn't know which one you were going to rob before you got up there?

"A.    No, sir, we had talked about the barbershop, and just any place.

. . . .

"X. Q.    Why was the car stopped at Second and Walnut, do you know?

"A.    Lawrence pulled it up there and stopped it.

"X. Q.    Why did he stop it, was you boys going to the toilet?

"A.    He just stopped the car, and we were talking about going out to a place.

"X. Q.    Which place?

"A.    Any place, sir, we were coming back from Evansville—

"BY MR. WEBER: Just answer the question.

"A.    We were going into the Goodyear tire, sir. My intentions were to include getting into the barbershop, Wilson said he knew the boy in Reed's Barbershop.

"X. Q.    You were thinking about getting into the Goodyear Tire Shop, and what was Wilson going to do?

"A.    He was going to get that change in the barbershop.

. . . .

"A.    When we got out of the car he asked us where we were going.

"X. Q.    What did you tell him?

"A.    I told him, 'the first place we came to.'

"X. Q.    That was the Citation T. V., wasn't it?

"A.    I don't believe I said anything about going into the Citation T. V.

"X. Q.   You said you got out of the car, and Wilson took your hand, and you two staggered up the street, and the first place you came to would be the Citation T. V., and he asked you where you were going, and you said 'the first place we come to'?

"A.      That is right."

This witness further testified that he "imagined" that *he and Wilson* talked about breaking into Reed's Barber Shop on the way back from Evansville.

Kenneth Terrell, a police officer of the City of Mount Vernon, testified as a witness for the State as follows:

That while on duty the night of May 9th, 1956, at about three o'clock in the morning he was standing at the corner of Second and Walnut Streets in the City of Mount Vernon, Indiana, when he saw Wilson Mattingly and William Ausley "walking up Second Street toward Main"; he watched them go to the rear of Reed's Barber Shop; that he then walked "back through" the alley as a police car arrived, and accompanied by Officer Storey went through the alley where they saw Wilson Mattingly and William Ausley coming back toward them; that they then examined the rear of Reed's Barber Shop and found that the east window had been forced open; that Wilson Mattingly was "in a state of intoxication" and one boy (Wilson Mattingly or William Ausley) "was pulling the other along" and they "were having a little trouble walking"; and that he arrested them (Wilson Mattingly and William Ausley) for public intoxication and they were taken to the jail by Officers McDaniel and Keitel.

This witness further testified that Lawrence Mattingly "came back to the scene" and drove "up behind Officer Terrell blowing his horn."

On cross-examination this witness further testified that he did not see any car at the time he first saw Wilson Mattingly and William Ausley; that he saw appellant's car parked "I judge 150 feet on down east, on Second Street, facing Main, east of Gentil's Cafe," but he did not see Wilson Mat-

tingly and William Ausley "come from the car," nor did he see the car before he saw the two boys, Wilson Mattingly and William Ausley, coming up the street; and that when appellant drove "back to the scene" he talked with the witness and Officer Storey and "wanted to know what the other two boys had done"; that he believed that appellant asked why the two boys were arrested, but didn't remember "off-hand" whether he told appellant or not.

Police Officer Ralph Storey, also a witness for the State, testified that about three o'clock in the morning "on or about May 9th and 10th," 1956, he and four other police officers were drinking coffee in Gentil's Cafe in Mount Vernon, Indiana, and as he walked out to the corner of Second and Walnut Street a "car drove up catty-cornered across the street, and Wilson Mattingly and William Ausley got out and came up the street," and "the one in the car hallowed at him, and I don't know what he said, but Ausley turned around and said 'the first damn place we come to' "; that the witness and the other officer then "walked to the corner to see where they (Wilson Mattingly and William Ausley) were going and they walked toward Main, to between the Barbershop and Mr. Allyn's office" where they then turned "in between the two buildings."

Regarding appellant directly, this witness testified as follows:

"Q. Did you see Lawrence Mattingly?

"A. That morning I did.

"Q. When did you first see him?

"A. When we first closed in on the boys he came up the street blowing his car horn.

"Q. Where did he come from?

"A. He was parked in front of 421 East Second Street.

"Q. And was that the same car Ausley and Mattingly had gotten out of?

"A. Yes, sir.

"Q. And he blew his horn?

"A. Yes, he blew his horn continuously from Second, up to Main, and until he came back on the scene.

"Q. When did he drive by?

"A. When we were putting the boys in the car.

"Q. Was he placed under arrest at that time?

"A. No.

"Q. When was he placed under arrest?

"A. Possibly six o'clock, or somewhere in that neighborhood."

This witness further testified, on cross-examination, that he first saw appellant when they "were putting" Wilson Mattingly and William Ausley in the police car, when appellant asked him if he thought they (Wilson Mattingly and William Ausley) pried open the window, and he replied that he did not know; that appellant went with him to look at the rear window of the barber shop and while the other boys were being put into the police car appellant "drove off"; that he arrested appellant about six o'clock the same morning "when he drove through a red light at Second and Main"; and that he put him under arrest "for suspicion to start with."

This concludes the State's evidence upon which it relies to sustain the conviction herein.

As heretofore stated, the State must prove the conspiracy charged in the affidavit. Testimony from which it might reasonably be inferred that the parties charged in the affidavit had an agreement or a common plan or purpose, to break into and enter

*some* place other than that charged in the affidavit is not, in itself, sufficient to sustain the conviction herein. *Kelley* v. *State* (1936), 210 Ind. 380, 385, 3 N. E. 2d 65.

Giving the State the full benefit of every reasonable inference that may be drawn from the evidence above set out and summarized, there is some evidence from which the court might have concluded that (1) Wilson Mattingly and William Ausley, while returning from Evansville to Mount Vernon—in an advanced state of intoxication—and in the presence of appellant while he was driving the car, talked about places they might "break into," but there is no evidence that appellant entered into or participated in these conversations between Wilson Mattingly and William Ausley; (2) Reed's Barber Shop was one of the places mentioned in such conversations; (3) appellant overheard and understood at least the general object of Wilson Mattingly and William Ausley's conversations; (4) appellant drove the car—his own—and stopped it a block or so from the barber shop where Wilson Mattingly and William Ausley got out; and (5) the final decision of Wilson Mattingly and William Ausley to break into the barber shop was made after they got out of the car and out of the presence of appellant.

The essentials necessary to constitute a conspiracy under the statute[3] are well established in this State and they are reaffirmed in *Robertson* v. *State* (1952), 231 Ind. 368, 370, 108 N. E. 2d 711, as follows:

"  'In order to be a conspiracy there must be an intelligent and deliberate agreement to commit

3. Acts 1905, ch. 169, §641, p. 584, being §10-1101, Burns' 1956 Replacement.

the offense charged. It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to do the acts and commit the offense, though the agreement is not manifest by any formal words. Concurrence of sentiment and co-operative conduct in the unlawful and criminal enterprise are the essential ingredients of criminal conspiracy. There must be an agreement and there must be evidence to prove the agreement directly, or such a state of facts that an agreement may be legally inferred. Conspiracies cannot be established by a mere suspicion. Evidence of mere relationship or association between the parties does not show a conspiracy.' "

We recognize also that "Participation in criminal conspiracy need not be proved by direct evidence but common purpose and plan may be inferred from development and collocation of circumstances." *Taylor, Bryant* v. *State* (1956), 235 Ind. 126, 131, 131 N. E. 2d 297. See also: *Mattingly* v. *State* (1957), 236 Ind. 632, 142 N. E. 2d 607.

There is no evidence here to show any agreement between appellant and the others named in the affidavit to commit the felony charged therein, nor is there any from which such an inference could be drawn.

There is, we believe, also a complete lack of evidence to show a common plan or purpose between appellant and either, or both, of the other parties named in the affidavit to break into and enter Reed's Barber Shop in Mount Vernon, Indiana, with intent to steal the property of Jesse Reed, as charged in the affidavit.

There is no evidence to show, nor is there any from which a reasonable inference could be drawn, that appellant even knew that Wilson Mattingly and William

Ausley were going to break into Reed's Barber Shop when he let them out of the car at about three o'clock in the morning near the corner of Second and Main Streets in Mount Vernon, Indiana, a "block or so from the Barbershop."

Even if the court believed, that as Wilson Mattingly and William Ausley left the car appellant said "What place are you going to break in" and Ausley replied, "the first damn place we come to," this, standing alone, would not be sufficient to show a common purpose or agreement between Wilson Mattingly and William Ausley, or either of them, and appellant to break into a specific place, namely, Reed's Barber Shop.

The affidavit charges a conspiracy to break into Reed's Barber Shop and steal and carry away the property of Jesse Reed. In our opinion the State has not sustained its burden of proving that such conspiracy existed.

The most that can be said of the evidence in this record is that it establishes a relationship and association between appellant and the others charged, and tends to establish a suspicion of guilt. This is not enough to sustain a conviction. *Robertson* v. *State, supra* (1952), 231 Ind. 368, 376, 108 N. E. 2d 711.

For the reasons above stated the evidence is not sufficient to sustain the decision of the trial court and is, therefore, contrary to law.

The judgment of the trial court is, therefore, reversed with instructions to sustain appellant's motion for a new trial.

NOTE.—Reported in 145 N. E. 2d 650.