**David A. WOODS, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 279S57.

Supreme Court of Indiana.

Dec. 18, 1980.

Harriette Bailey Conn, Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Kathleen G. Lucas, Deputy Atty. Gen., Indianapolis, for appellee.

PRENTICE, Justice.

Defendant (Appellant) was convicted in a jury trial of conspiracy to commit battery with a deadly weapon, Ind.Code § 35–41–

5–2 (Burns 1979) and of being an habitual offender, Ind.Code § 35–50–2–8 (Burns 1979). He was sentenced to thirty–five (35) years imprisonment. This direct appeal presents six issues relating to jury instructions given and refused, in addition to an assignment that the evidence was insufficient, but because we have determined that there was insufficient evidence from which the jury could find the defendant guilty upon the conspiracy charged, we reverse the judgment, and it is unnecessary for us to address the instructions issues.

The information filed in this case reads in pertinent part:

"On or about the 21st day of January, 1978, in Fountain County, in the State of Indiana, David Woods, Rick Kiger and Larry Kiger, each with intent to commit a felony, to–wit: Touch another in a rude, insolent, or angry manner, with a deadly weapon, to–wit: Clubs, did agree with each other to commit the said felony, namely Battery with a Deadly Weapon, and the said David Woods and Rick Kiger did perform an overt act, to–wit: Exit Wood's (sic) car armed with clubs in furtherance of the agreement, to–wit: To commit battery."

The elements of a charge of conspiracy are an agreement between two or more persons to commit the felony charged, and an overt act performed in furtherance of the agreement. Ind.Code § 35–41–5–2 (Burns 1979); *Coughlin v. State* (1950) 228 Ind. 393, 395, 92 N.E.2d 718, 719; *Johnson v. State* (1935) 208 Ind. 89, 95, 194 N.E. 619, 621. The existence of the agreement may be inferred from the conduct of the parties or proved by circumstantial evidence. *Patterson v. State* (1979) 386 N.E.2d 936, 942, cert. denied (1979) 444 U.S. 935, 100 S.Ct. 283, 62 L.Ed.2d 194; *Robertson v. State* (1952) 231 Ind. 368, 369, 108 N.E.2d 711, 712–13. But it cannot be inferred from the commission of the criminal act alone, or from the overt act alone taken pursuant to the criminal activity.

The conspiracy charge arose from a Saturday night gang fight participated in by teen aged boys and young men in Veeders-

burg. The fight was a culmination of earlier hostilities between Kenny Kiger and Randy Day and between Junior Shumaker and the defendant. Kenny Kiger and Day had had an altercation at school on the preceding day and another earlier Saturday evening at the town skating rink. The defendant, and Rick Kiger had had an unrelated altercation, also at the skating rink, with Junior Shumaker earlier Saturday evening.

During their incident at the skating rink, Day called Kenny a seemingly innocuous name, which apparently was nevertheless, offensive to Kenny. He also struck Kenny twice. Kenny did not fight back but said. "I'll find my older brother (meaning Rick Kiger) and we'll see about that later."

Delilah Rusk, a fourteen or fifteen year old girl, was with Kenny both at the time of the altercation at school and the one at the skating rink.

The only direct evidence of a conspiracy came from her and was as follows:

Following the fight at the rink, Delilah and Kenny left in search of Kenny's brother, Rick. They found him at Delilah's home, where he had just arrived in the company of the defendant and Larry Kiger. The three were in the defendant's automobile. Meanwhile, Day had repaired to a nearby poolroom and joined other young friends there, J. R. Sullivan, Percy Sandlin and Greg Fleck. Apparently this was known to Delilah and Kenny.

Delilah and Kenny got into the defendant's automobile and said that Day was looking for them and that he had struck Kenny. Rick said, "Well, I don't want nobody picking on my little brother," and "Well, let's just go down and get 'em."

Defendant, accompanied by Rick, Larry, Kenny and Delilah drove directly to the poolroom a short distance away. On the way, one of the boys asked how many there were, and Kenny replied, lots of them, to which Rick responded, "Well, we can just go to Cates (a neighboring town) and get enough to take care of them."

The defendant parked the automobile at the front of the establishment, where they could see inside and the occupants of the poolroom could see them. Upon arrival of defendant and his companions, they again became concerned about their being outnumbered by the group inside. The defendant exhibited a chain with a handle attached to it and said, "I got something to take care of that." The others looked about the automobile, as if searching for weapons, but the witness saw no other weapons. Cates was mentioned again, and they considered going there for reinforcements, but no decision was made.

For some ten or fifteen minutes the two adversary groups contented themselves with shouting obscenities and making obscene gestures at each other. Ultimately, Delilah stepped into the poolroom and shouted, to the group, but to no one in particular, "They're ready any time you are!" and returned to the automobile.

Meanwhile, two of the boys inside the pool hall had gone to a nearby truck repair garage and advised Mark Hinote, Junior Shumaker and Daniel Shumaker, that the defendant and his friends were waiting for them in front of the poolroom. Hinote and the Shumakers walked to the scene.

The group inside the poolroom did not respond immediately to Delilah's message, but did so just as Hinote and the Shumakers arrived. They exited from the poolroom, and Rick Kiger upon seeing that they were substantially outnumbered, said "Let's go to Cates. Tell them we'll be back." Simultaneously, the defendant started to drive away.

There was packed snow and ice in the streets, and as the defendant moved the automobile to leave, Randy Day threw a large ice clod or snow ball, which struck the windshield of the automobile. With that, the defendant stopped the vehicle,[1] saying, "That son of a bitch has had it!" and got out of the car. Rick and Kenny Kiger immediately followed, and a general melee

broke out. Delilah and Larry Kiger remained in the automobile. Defendant had an iron rod, also referred to as a "pipe" and as a "bar," identified as an automobile jack handle extension. He was swinging it at the crowd from the poolroom. As they scattered, he went towards Mark Hinote with it, but a spectator interceded and disarmed him before he could strike anybody.

Rick Kiger had a chain to which a handle was attached when he got out of the vehicle. He started swinging it at Kenny Parker, missing him on the first try but hitting him in the head on the second attempt. Parker, however, with assistance from Junior Shumaker, took the chain away from Rick and struck him with it.

Kenny Kiger swung a weapon variously described as a club and as a stick at Randy Day. Day, however, grabbed it and fended the blow. At the same time, Sullivan stabbed Kenny with a knife. Kenny ran up the street yelling that he had been stabbed, and the brawl ended.

It is the State's position that a conspiracy, by Defendant and Rick and Kenneth Kiger, to commit battery with a deadly weapon could be inferred from the circumstances. Its argument is as follows:

"Certainly a conspiracy can be inferred from the prior arguments between the parties, the fact that the younger Kiger went to get his brother before he would fight, the fact that all the co–defendants sat in the car issuing challenges and sent Delilah to report that they were ready to fight. If any occupant of the car had not chosen to become involved in the attack, there was time to leave the car before it began. It was reasonable to infer from their actions that they planned to attack those people in the pool hall. Defendant does not deny that the weapons were 'deadly weapons' as charged in the information. There is also no disputing the fact that Defendant and his co–conspirators committed the necessary 'overt acts' required by statute. Rick Kiger even

---

1. Some of the State's witnesses testified that the defendant's vehicle had not yet started to move. Others, including Delilah Rusk, testified

that it had. All agreed that the incendiary event was the throwing of the ice clod or snow ball.

committed an actual battery which is more evidence than is required to be shown in a conspiracy charge."

We are of the opinion, however, that only an agreement to brawl can be inferred from the evidence most favorable to the State. Although paraphernalia that, in context, can be regarded as deadly weapons were used by the defendant and his companions, we find no evidence from which an agreement among them to do so can be found beyond a reasonable doubt.

"Upon a review for sufficient evidence, this Court will look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. If the existence of each element of the crime charged may be found therefrom, beyond a reasonable doubt, the verdict will not be disturbed." (citation omitted). "In such a review, we will not weigh conflicting evidence nor will we judge the credibility of the witnesses." (citation omitted). *Loyd v. State* (1980) Ind., 398 N.E.2d 1260, 1264.

Upon a claim of insufficient evidence, however, it does become our duty to examine the evidence closely, not with a view towards resolving conflicts thereon, but for the purpose of determining whether or not, after resolving all reasonable doubts in favor of the verdict, it may be said that, upon such evidence, a reasonable man could have reached such verdict, beyond a reasonable doubt.

In the leading case in this State establishing the duty of this Court to so review the evidence, *Baker v. State* (1956) 236 Ind. 55, 138 N.E.2d 641, we said:

"In considering the standard by which we review the evidence where it is challenged as being insufficient to sustain a verdict or finding, this court has often said there must be substantial evidence of probative value before we can decide an accused has been proven guilty beyond a reasonable doubt. 'This last rule places the evidence before the court on appeal, not for the purpose of weighing it, or for the purpose of determining the facts when there is actual conflict, but for the purpose of deciding, as a question of law, whether or not there is substantive evidence in support of the required material facts essential to a conviction. It is not enough to sustain a conviction that the evidence, when given full faith and credit, may warrant a suspicion or amount to a scintilla." 236 Ind. at 60, 138 N.E.2d 641.

"'. . . We use the word "substantial" as meaning more than "seeming or imaginary." '" 236 Ind. at 60, 138 N.E.2d at 641.

\* \* \* \* \* \*

"The rule of law defining proof beyond a reasonable doubt has been well settled for many years and requires each juror to be so convinced by the evidence that as a prudent man he would feel safe to act upon such conviction in matters of the highest concern and importance to his own dearest and most important interests, under circumstances where there was no compulsion or coercion upon him to act at all. *Chambers v. State* (1953), 232 Ind. 349, 356, 111 N.E.2d 816; *Morgan v. State* (1921), 190 Ind. 411, 130 N.E. 528; *Bradley v. State* (1870), 31 Ind. 492. The standard of a prudent man is that of a reasonable man. If different persons might reasonably arrive at different conclusions from that reached by the trial jury, the verdict will not be set aside for that reason. *Davidson v. State* (1933), 205 Ind. 564, 576, 187 N.E. 376. On the other hand if no reasonable man could find the evidence has proved an accused guilty beyond a reasonable doubt, a verdict would not be sustained by sufficient evidence." 236 Ind. at 61, 138 N.E.2d 641.

We further quoted, with approval, from *State v. Gregory* (1936), 339 Mo. 133, 96 S.W.2d 47, as follows:

"\* \* \* 'Now since the test of substantial evidence is whether a jury reasonably could find the issue thereon, the result must depend in some measure upon the degree of persuasion required. In a criminal case liberty and sometimes life are involved, and there cannot be a conviction

except upon a finding of guilt beyond a reasonable doubt. Necessarily, therefore, it becomes the duty of an appellate court as a matter of law to decide whether the evidence was sufficient to induce a belief of the defendant's guilt beyond a reasonable doubt in the minds of jurors of average reason and intelligence. * * * In no other way can the rights of the defendant be protected. It would be an incongruous situation if the court were compelled to let a conviction stand as being supported by evidence warranting a verdict of guilt beyond a reasonable doubt, when *for any reason* made manifest on the record the court is convinced the evidence reasonably could not support a conviction.'" *Baker v. State, supra*, 236 Ind. 55, 62–63, 138 N.E.2d 641.

We borrow no problem concerning the credibility of the testimony from the State's chief witness, Delilah Rusk. Some of her most incriminating testimony was the product of leading questions reciting the prosecutor's conclusions as to her prior answers. In some instances, however, the recited conclusions were not fairly inferable from the prior answers and, in fact were in conflict with them. For example:

Q. "Did anyone else find any weapons?"

A. "I think so but I wasn't looking. I couldn't have saw it."

Q. "Now after Dave pulled this out, the other members in your car also looked for weapons in the car."

A. "Yes."

We are, therefore, left to wonder whether it was the witness or the prosecutor who testified that the boys looked for weapons at that time. There had been no previous testimony that the defendants "looked for weapons."

Be that as it may, however, and crediting all such testimony to Delilah and assuming it to be true, we, nevertheless, find no evidence of a conspiracy by the defendant and his companions to attack any of their adversaries with clubs, in particular, or with deadly weapons, in general.

■ A conspiracy entails an intelligent and deliberate agreement, a meeting of the minds. Although such an agreement may be inferred from the circumstances and need not be proved by direct evidence, it must, nevertheless, be proved. A conspiracy may not be established by mere suspicion. *Mattingly v. State* (1957) 237 Ind. 326, 145 N.E.2d 650.

In reversing the *Mattingly* conviction, we summarized the evidence as follows:

"Giving the State the full benefit of every reasonable inference that may be drawn from the evidence above set out and summarized, there is some evidence from which the court might have concluded that (1) Wilson Mattingly and William Ausley, while returning from Evansville to Mount Vernon–in an advanced state of intoxication–and in the presence of appellant while he was driving the car, talked about places they might 'break into,' but there is no evidence that appellant entered into or participated in these conversations between Wilson Mattingly and William Ausley; (2) Reed's Barber Shop was one of the places mentioned in such conversations; (3) appellant overheard and understood at least the general object of Wilson Mattingly and William Ausley's conversations; (4) appellant drove the car–his own–and stopped it a block or so from the barber shop where Wilson Mattingly and William Ausley got out; and (5) the final decision of Wilson Mattingly and William Ausley to break into the barber shop was made after they got out of the car and out of the presence of appellant." 237 Ind. at 338, 145 N.E.2d 650.

We concluded, "There is, we believe, also a complete lack of evidence to show a common plan or purpose * * *." *Id.* at 339, 145 N.E.2d 650.

*Robertson v. State* (1952) 231 Ind. 368, 108 N.E.2d 711 was similar to *Mattingly v. State.* The incriminating evidence was summarized and held to establish no more than a suspicion of a conspiracy by the appellant.

"Analyzing the evidence as summarized above, it appears that there was sufficient evidence of probative value together with certain facts from which the jury might have legally inferred that (1) the safe here involved was stolen from the place of business described in the affidavit by someone on the night of March 15, 1951; and (2) that the safe had been broken open and $1,201.90 taken from it before it was abandoned on a country road outside of Bloomington; (3) that appellant owned a Dodge truck and that the stolen safe was transported in appellant's truck sometime between 10:10 p. m. on March 15 and eight o'clock a. m. on March 16, 1951, to the place where it was abandoned on the country road outside of Bloomington; (4) that appellant was in the place of business from which the safe was stolen for a few minutes on or about March 2, 1951; (5) that Arthur and Bowers, two of the alleged conspirators, were in the place of business from which the safe was stolen on or about March 6, 1951; (6) that appellant had known Arthur and Bowers for a number of years, and that the three of them were together frequently both before and after March 15, 1951 in taverns other than the one from which the safe was stolen, and on occasions in appellant's truck, and at one time in his home; and (7) that Bowers, one of the alleged conspirators, had some connection with the theft." 231 Ind. 375–76. 108 N.E.2d 711.

" * * * There is no evidence directly proving an agreement between appellant and Arthur and Bowers, or either of them, to steal the safe in question, nor is the state of facts here presented such that an agreement can be legally inferred." *Id.* at 376, 108 N.E.2d 711.

Throughout the Indiana cases wherein we have examined the evidence of charged conspiracies, we have said that *concurrence of sentiment* and cooperative conduct in the criminal enterprise are the essential ingredients. *Mattingly v. State, supra; Robertson v. State supra; Coughlin v. State* (1950) 228 Ind. 393, 395, 92 N.E.2d 718.

From the evidence in the case before us, it is clear that the defendant and his companions agreed to engage in a brawl. It is also clear that they did engage in that brawl and in so doing assaulted their adversaries with weapons, albeit unsuccessfully. However, there is not one iota of evidence that there was *an agreement, a meeting of the minds, a concurrence of sentiment,* concerning the use of weapons. In fact, the evidence clearly reflects that, although the defendant indicated that he would "equalize" the adventure by use of the chain, if necessary to compensate for meeting superior numbers, and although it may be fairly inferred that the group deliberated upon the suggestion, the plan ultimately adopted was to flee the scene and enlist reinforcements in Cates. That decision had been made and the plan embarked upon when an intervening force, a clod of ice or snow thrust against the windshield, sparked a spontaneous attack by the defendant, followed immediately by the others. If we were called upon to determine whether or not the evidence warranted a conclusion that the defendant intended a battery with a weapon, we would be compelled to say that such could be fairly inferred from the use of the weapon. But a conspiracy, a meeting of the minds upon a deliberate scheme or plan cannot be inferred, beyond a reasonable doubt, from such meager evidence.

" * * * Concurrence of sentiment and cooperative conduct in the unlawful and criminal enterprise are the essential ingredients of criminal conspiracy. There must be an agreement and there must be evidence to prove the agreement directly, or such a state of facts that an agreement may be legally inferred. Conspiracies cannot be established by the (sic) mere suspicion. Evidence of mere relationship or association between the parties does not show a conspiracy." *Coughlin v. State* (1950) 228 Ind. 393, 395, 92 N.E.2d 718, and cases there cited.

" * * * ' ... The law is that the life or liberty of a citizen shall be taken only in case the right to do so is established beyond all reasonable doubt; * * *.' "

*Penn v. State* (1957) 237 Ind. 374, 379, 146 N.E.2d 240.

And while the foregoing statement is a rule for the guidance of the trier of fact, when it is apparent from an examination of the evidence and reasonable inferences favorable to the State, that no reasonable man could find guilt beyond a reasonable doubt, such a verdict is not sustained by the evidence. It is, therefore, contrary to law, and it becomes our duty to set it aside. *Baker v. State, supra; Manlove v. State* (1968) 250 Ind. 70, 232 N.E.2d 874.

The verdict is not sustained by the evidence. Accordingly, the judgment of the trial court is reversed.

DeBRULER and HUNTER, JJ., concur.

GIVAN, C. J., dissents with opinion in which PIVARNIK, J., concurs.

GIVAN, Chief Justice, dissenting.

I respectfully dissent to the majority opinion in this case. The majority correctly states the law of conspiracy. The cases cited by the majority wholly support the trial court in this case. Although, as pointed out by the majority opinion, the prosecuting attorney did lead a witness, there was in fact evidence from which the jury could determine that the appellant did in fact conspire with others to travel in an automobile to another location in the town for the express purpose of engaging in a fight with another group of persons.

The fact that the persons travelling in the automobile took instruments; to–wit: An iron rod, a chain with a handle, and a stick or club, is evidence from which the jury could conclude that each of the participants intended to use such weapons and planned with his cohorts that they should do likewise.

For this Court to reverse the trial court in this case, it is necessary that we weigh the evidence and come to a conclusion contrary to facts found by the trial court. This, we have stated on many occasions, we should not do.

I would affirm the trial court in this case.

PIVARNIK, J., concurs.