JACK SHINDLER; HELEN HUNTER v. STATE OF INDIANA.

[No. 1-374A45. Filed October 14, 1975. Rehearing denied November 25, 1975. Transfer denied March 10, 1976.]

*James A. Neel*, of Indianapolis, for appellant Shindler; *Ferd Samper, Jr.*, of Indianapolis, for appellant Hunter.

*Theodore L. Sendak*, Attorney Genral, *Robert S. Spear*, Deputy Attorney General, for appellee.

LOWDERMILK, J.—This is an appeal by defendants-appellants, Helen Hunter and Jack Shindler, from their convictions for conspiracy to commit the felony[1] of exerting unauthorized control over the property of another.[2]

## FACTS:

Viewed most favorably to the State, the pertinent facts reveal that Stanley D. Milhous (Milhous), the alleged victim

---

1. IC 1971, 35-1-111-1, Ind. Ann. Stat. § 10-1101 (Burns 1956).
2. IC 1971, 35-17-5-3, Ind. Ann. Stat. § 10-3030 (Burns Supp. 1974).

of the conspiracy, was approximately eighty (80) years old when the sequence of events culminating in this appeal began. Milhous lived alone on the remainder of a family farm, and also owned, by inheritance from a deceased spouse, farmland in North Dakota and a house in Indianapolis. While Milhous was able to care for himself, there was evidence that he had glaucoma in one eye and a cataract in the other, thus making it difficult for him to read under certain conditions.

Milhous first met Hunter in 1970 when she was working in a drugstore. Shortly thereafter, Milhous met Shindler while purchasing a car from him for Hunter. Milhous testified that sometime thereafter he met with Shindler to execute to him a power of attorney. Unbeknown to Milhous, this power was actually in favor of Hunter, who later had the document notarized with the aid of a third person who Milhous stated he never knew.

In December of 1971, Hunter and Milhous went to Valley City, North Dakota in a 1969 Ford purchased by Hunter with funds borrowed from Milhous. Milhous and Hunter met Milhous' attorney, Roy Ployhar, at Valley City and arranged for the withdrawal of proceeds which had accumulated from the rental of Milhous' North Dakota farmland. A certificate of deposit (CD) held in Milhous' name at the American National Bank of Valley City, North Dakota, which totaled $20,229.28, was cashed by Hunter and Milhous. Although the evidence in the record reveals that Hunter showed her power of attorney to the teller at the time the CD was cashed, she gained physical control over the proceeds with Milhous' consent. The proceeds from the CD were divided into the following amounts:

   (1)  Cashier's check to Milhous and Hunter for $18,219.28, the amount the defendants were charged in the indictment with conspiring to steal;

   (2)  $500.00 for a legal fee to Roy Ployhar;

   (3)  $1,010.00 in traveler's checks purchased by Hunter;

   (4)  $500.00 in cash to Hunter.

Milhous never told Hunter that she could spend the money that she obtained from the CD for her own use. Rather, he told her to keep a strict accounting of these funds, particularly the cashier's check which he asked her to place in the bank for safekeeping for himself.

Upon leaving Valley City, Milhous and Hunter went to Hunter's son's house in Tacoma, Washington. Early in 1972, Hunter and Milhous returned to Indianapolis and Hunter took Milhous to her daughter's home on the east side of Indianapolis. Next, Shindler took Milhous to the Hoosier Poet Motel in Greenfield, Indiana, and without Milhous' knowledge registered him into the motel under the name of "Jones". Milhous stayed in the motel for approximately two weeks and had his food brought to him by Hunter, Shindler, or Shindler's assistant.

Shindler then took Milhous from the Hoosier Poet Motel to Shindler's sister's house in Las Vegas, Nevada, for the ostensible purpose of obtaining a Nevada divorce for Milhous. After keeping Milhous at his sister's residence for approximately one week, Shindler signed Milhous into the Beverly Manor Convalescent Hospital in March 14, 1972, under the name of "Stanley Brown". The bills for the services provided by Beverly Manor were sent to defendant Hunter.

While Milhous was in the convalescent home Shindler filed a change of address card with the Bridgeport Post Office, resulting in Milhous's social security checks being sent to Shindler's address in Indianapolis. This action was never authorized by Milhous, who testified that during his fifteen month stay in Beverly Manor he never received any social security checks.

Hunter had a checking account with the Merchants National Bank in Indianapolis, Indiana. Her balance was $42.27 in November of 1971; however, by the end of December, 1971, the balance was $20,278.39. A deposit of $20,000.00 had been made into this account on December 21, 1971, five days after

Hunter and Milhous had cashed Milhous's CD in Valley City, North Dakota. Between January 26, 1972, and September 28, 1972, Hunter wrote checks on this account to Shindler for a total amount of $4,410.00, although Shindler had never asked Milhous to pay him an attorney's fee. Between January 7, 1972, and March 30, 1973, Hunter wrote checks on this account to herself for a total amount of $5,234.00. Additional amounts were distributed from this account by Hunter and paid to her family. Hunter also drew two $2,500.00 checks to Shindler on Milhous's checking account in the First National Bank and Trust Company of Plainfield, Indiana. These checks were paid by virtue of Hunter's power of attorney, that Milhous had unknowingly signed over to her on or about October 20, 1971.

## ISSUES:

Hunter and Shindler raise six arguments in support of their appeal. The issues, and the order in which they will be considered here, are as follows:

(1) Was there a failure of proof of the crime with which appellants were charged.

(2) Was the order of the court separating witnesses violated when a newspaper reporter was allowed to remain in the courtroom and write articles about the trial which were later read by two witnesses.

(3) Should the newspaper reporter have been required to disclose the name or names of her initial sources.

(4) Was Milhous incompetent to testify by reason of a prior appointment of guardian.

(5) Was it error to admit into evidence a "mug-shot" photograph of Hunter.

(6) Was the evidence sufficient to support the conviction.

## I.

The first argument raised by Hunter and Shindler is that they were charged under the theft statute ("exerting unauthorizd control") while the proof, at most, indicates a violation of failing to make a required disposition of property re-

ceived, codified at IC 1971, 35-17-5-4, Ind. Ann. Stat. § 10-3031 (Burns Supp. 1974).

Appellants contend that it was "absolutely improper" to charge them under the general theft statute and then offer proof of a crime which they characterize as "embezzlement." It is asserted that this impropriety is not a mere variance, but a fatal failure of proof which requires reversal and dismissal of the charges.

Appellants rely primarily on *Johnson* v. *State* (1973), 158 Ind. App. 611, 304 N.E.2d 555, where § 10-3031 was extensively discussed. In that case, the court stated that

> "The Indiana Legislative Advisory Committee Report of the Criminal Code Study Commission, Appendix 1, at 281 (1962) states that § 3031 was added to the Offenses Against Property Act 'to take care of the *rare* case where a prosecutor doubts that an offense has been committed under § 10-3030 because the funds in question have never been in the possession of the victim.'

> \* \* \*

> "The 'rare case' involving property which has never been in the possession of the victim represents the only apparent *new* crime sought to be embraced within § 3031. This is not to say, however, that § 3031 does not embrace crimes theretofore existent *as* defined by prior statutory enactments. We view § 3031 as primarily a replacement for various forms of embezzlement but containing as well a provision for punishment of 'rare cases' such as delineated by the Study Commission example." (Original emphasis.)

The court went on to hold that debtor-creditor situations were not within the ambit of § 10-3031.

Initially, we believe the above interpretation demonstrates that the alleged acts of Hunter and Shindler do not fall within the concept of the "new" crime created by § 10-3031. Clearly, we are not here concerned with a situation where Milhous never had possession of the money. The money ultimately received by Hunter was in Milhous' personal bank account, and was therefore in Milhous' sole constructive possession

prior to the withdrawal in 1971. It remains, however, to determine whether the alleged acts and proof indicate that the proper charge was one of embezzlement.

11 I.L.E. Embezzlement § 1, p. 516 succinctly sets forth the elements of the crime and the point of distinction between it and the crime of larceny (theft):

> "Embezzlement is the fraudulent and felonious appropriation of another's property by a person to whom it has been intrusted, or into whose hands it has lawfully come. Embezzlement differs from larceny in that it is the wrongful appropriation or conversion of property where the original taking was lawful, or with the consent of the owner, while in larceny the taking involves a trespass and the felonious intent must exist at the time of such taking."

This definition, however, must be viewed in light of two recent Indiana Supreme Court cases. In *Green* v. *State* (1972), 258 Ind. 481, 282 N.E.2d 548, the defendant obtained an employer's payroll check and cashed it after changing the original amount stated thereon. The defendant contended that it was improper to convict her of exerting unauthorized control over another's money (§ 10-3030(1)(a)) when, at most, she was guilty of theft by deception (§ 10-3030(1)(b)).

The court responded to the defendant's arguments by stating, *inter alia*, that

> "The first part of the statute in question *does not limit the means or method by which unauthorized control may be obtained.* We can conceive of many situations in which some element of deception may be involved, such as picking pockets or distracting attention at the time control is gained. In our opinion, *the prosecuting attorney has the option of determining whether or not he desires to make the charge specific under some specified section of the statute,* or to make the charge general in nature when the evidence is not certain as to the methods used to gain control.

> \* \* \*

> "In the case before us, the section defining theft as when one 'knowingly obtains or exerts unauthorized control over property of the owner' comprehends a very broad field

of theft, including any other narrowly defined activity specifically defined in the statute . . ." (Our emphasis.)

The court then set out the stated purpose of the Offenses Against Property Act as the consolidation of

". . . all of the theft group of crimes except robbery, and traditional terminology has been abandoned in order that that purpose may be achieved. Consequently, whenever the terms 'larceny,' 'obtaining by false pretenses,' 'embezzlement,' 'receiving or concealing property knowing it to have been stolen,' 'blackmail,' or similar terms are used in any existing procedural or substantive statute or rule, *they shall be construed to mean theft as described* herein." (Our emphasis.)

One month later, in *Dobson* v. *State* (1972), 258 Ind. 655, 283 N.E.2d 771, the Supreme Court had occasion to again consider the breadth of § 10-3030(1)(a). In this case, defendant Dobson picked up another's television for repair and took it to his shop. Subsequently the owner of the television called at the shop, but was informed that the item had been loaned to a third party without the owner's consent. After much delay, Dobson was finally charged under Sec. 10-3030(1)(a).

The court found that

". . . there was clearly sufficient evidence in this case to prove that the appellant exerted unauthorized control over the television when he allowed another customer the use of the set without authorization."

It is our conclusion that *whether or not* Sec. 10-3031 contemplates crimes which may contain the elements of traditional embezzlement, the cases and statement of legislative purpose, *supra,* do evince an intent that the general theft provision include acts previously classified under the general rubric of embezzlement. Therefore, if there are sufficient facts to show a violation of the general theft provision, it is immaterial whether Hunter and Shindler *could* have been charged under another section. We therefore look to the facts only for the purpose of determining whether

they support a finding that Shindler and Hunter exerted unauthorized control over the property (money) of Milhous.

The evidence most favorable to the State is that Shindler secured a power of attorney from Milhous, and that this power was for Hunter, although Milhous did not know it. Further, although Milhous consented to the withdrawal of his funds from the North Dakota bank, he directed Hunter to keep it in an account for *his* future use. Instead, Hunter immediately deposited the money in her personal account, used the money for her benefit, and wrote checks to Shindler and other members of her family.

In addition, Shindler filed a change of address for Milhous, and, without Milhous' consent, received Milhous' social security checks for over one (1) year.

Finally, the evidence is that Hunter and Shindler moved Milhous about the state and the country under various assumed names, and that no explanation of such conduct was given Milhous.

We believe that the above facts are clearly sufficient to show that, at the least, Hunter and Shindler intended to deprive Milhous of the use and benefit of his property by exerting unauthorized control over the same. Therefore, there is ample proof to support a charge under § 10-3030(1)(a), and appellants' first argument must fail.

## II.

We next consider whether there was a fatal violation of the separation of witnesses order when newspaper articles written by one witness who remained in the courtroom were read by two other witnesses prior to the giving of their testimony.

There is no dispute that the trial court granted appellants' motion for separation of witnesses. Further, said order directed that witnesses should *not discuss* testimony among themselves.

It is the contention of Shindler and Hunter that witnesses Shaw and Buck were apprised of the testimony of others by the articles published in the newspaper, and that said communication was a violation of the court's order. Appellants assert that it makes no difference that the communication was written instead of verbal.

While we might agree that the articles amounted to a violation of the separation order, we do not find such a violation to be reversible error in this case.

Although Hunter and Shindler allege a violation of the order, they do not state how they were harmed by said violation. Not every violation of such an order supports a motion for mistrial or a reversal. *Harris* v. *State* (1974), 262 Ind. 208, 314 N.E.2d 45; *Wright* v. *State* (1972), 259 Ind. 197, 285 N.E.2d 650. Allowing a witness to testify after a violation of such an order is within the discretion of the trial court. *Rogers* v. *State* (1974), 262 Ind. 315, 315 N.E.2d 707; *Marine* v. *State* (1973), 158 Ind. App. 72, 301 N.E.2d 778.

In the case at bar, the witnesses who read the articles testified respectively, that Shindler lived at a certain address, and gave an expert opinion that certain signatures were genuine. Inasmuch as appellants have not specified how they were prejudiced, we fail to see how permitting the above testimony was an abuse of the trial court's discretionary power.

### III.

The third issue is whether the trial court should have directed reporter Carolyn Pickering Lautner to disclose the initial sources which prompted her investigation of the Milhous situation.

Appellants argue that Lautner cannot invoke the "newspaper shield law"[3] because she was acting as an agent or as-

---

3. IC 1971, 34-3-5-1 (Burns Code Ed.).

sistant for the State at trial, *and* when her initial investigation was being conducted. It is pointed out that it was Lautner's investigation which led to the filing of criminal charges, and that during said investigation, she made use of State services and resources.

Shindler and Hunter contend that the refusal of the trial court to direct disclosure denied them a fair trial because they were thereby deprived of information which may have been helpful or exculpatory.

The statute put in issue by the above arguments reads, in its entirety, as follows:

> "34-3-5-1 [2-1733]. Newspapers, television and radio stations—Press associations—Employees and representatives—Immunity.—Any person connected with, or any person who has been so connected with or employed by, a newspaper or other periodical issued at regular intervals and having a general circulation, or a recognized press association or wire service, as a bona fide owner, editorial or reportorial employee, who receives or has received income from legitimate gathering, writing, editing, and interpretation of news, and any person connected with a licensed radio or television station as owner, official, or as an editorial or reportorial employee who receives or has received income from legitimate gathering, writing, editing, interpreting, announcing or broadcasting of news, shall not be compelled to disclose in any legal proceedings or elsewhere the source of any information procured or obtained in the course of his employment or representation of such newspaper, periodical, press association, radio station, television station, or wire service, whether published or not published in the newspaper or periodical or by the press association or wire service or broadcast or not broadcast by the radio station or television station by which he is employed."

The only Indiana cases to consider the above provision have held that the privilege granted is one which can be invoked only by the reporter, not the source. *See, Lipps* v. *State* (1970), 254 Ind. 141, 258 N.E.2d 622; *Hestand* v. *State* (1971), 257 Ind. 191, 273 N.E.2d 282. While these cases do not provide a complete answer in the case at bar, they are crucial when examined in light of appellants' argument.

In effect, appellants present a two-stage argument, with the second stage dependent upon the validity of the first. Hunter and Shindler contend, first, that Lautner was acting as a State agent and not as a reporter. Thus, it is alleged Lautner is not within the protection afforded by the shield law. Second, assuming the validity of the above, it is contended that the *State* should disclose Lautner's initial sources; hence reliance upon the case of *Brady* v. *Maryland* (1962), 373 U.S. 83, which held that the prosecution could not withhold evidence bearing on the guilt or punishment of a defendant. We must, therefore, initially determine whether Lautner was an agent of the State.

Appellants do not cite to this court any evidence which indicates that Lautner was working under the direction or control of the State. While it is true that Lautner spoke with various officers, and used police agencies, there is no evidence that she disclosed to police her complete findings, or that police requested particular information from her.

There remains, however, the fact that Lautner sat with the prosecution at trial and, apparently, aided the State in its presentation of evidence and/or examination of witnesses. Again, the appellants do not favor us with any particular example of how Lautner assisted the State. Thus, the assertions by Shindler and Hunter stand unsupported by reference to either case law or the record. We conclude, therefore, that there is no evidence that Lautner acted as an agent of or for the State, either during the investigatory or trial stages of this prosecution.

While we find as we do on this issue, we deem it necessary to comment briefly on the general practice of allowing reporters at the prosecution's table at trial. Such a practice can only confound the judicial process. While investigative reporting may have its place in revealing criminal activity, especially of the public nature, a prosecution is action by the State against particular per-

sons. We beileve the State has adequate resources and personnel to try criminal cases without the in-court assistance of newspaper reporters. If Lautner was giving aid to the State, it should have been given before trial. If, however, she was at the prosecutor's table merely to gather material for her articles, we consider such a practice wholly improper. Finally, we believe that the publcation of articles containing the testimony of witnesses while a separation order is in effect can only invite error in future trials. This conduct is such that it should be closely controlled by the court in the interests of a fair administration of justice.

The remaining point in Issue III is whether the State should have disclosed Lautner's sources.

As noted, we find no evidence that Lautner ever disclosed to police the names of her initial sources. It is fatal therefore that in their brief appellants argue that the *State* should be compelled to reveal such information. The State does not have the right, in the face of the statute, to require Lautner to give *them* the names of her sources. Thus appellants' contention that the State reveal such information is without force or effect.

Hunter and Shindler do not attack the validity of the "shield law." Rather, they argue that Lautner has removed herself from the statute's coverage by her conduct. Accordingly, appellants do not claim on appeal that Lautner *as a reporter* would not have the privilege to remain silent, but that Lautner was not a reporter within the meaning of the statute. We have found above that Lautner was acting in a reportorial capacity with regard to this matter, and therefore, we find appellants' arguments unpersuasive.

## IV.

Appellants' fourth argument is that the State's chief witness, Stanley Milhous, was incompetent to testify at trial.

Hunter and Shindler note that Milhous, in a prior separate proceeding, had been adjudged incompetent and had had a guardian appointed for his estate and person. Further, appellants assert that Milhous demonstrated numerous memory lapses and inconsistencies during the trial. For the above reasons, it is contended that it was error to allow Milhous to testify.

The only authority cited in support of the above argument is *Kolb* v. *State* (1974), 162 Ind. App. 115, 318 N.E.2d 382. In that case the court upheld the trial court's determination of the incompetency of a witness, and noted that expert testimony is not necessarily conclusive of the issue.

The competency of any witness is to be decided by the trial court as a matter of law. *Kimble* v. *State* (1974), 262 Ind. 522, 319 N.E.2d 140; *Martin* v. *State* (1969), 251 Ind. 587, 244 N.E.2d 100. Further, it has been established that faulty memory or inconsistent statements alone do not render an adult witness incompetent. *Kimble, supra; Curry* v. *State* (1969), 252 Ind. 347, 248 N.E. 2d 30.

The first statutory provision relevant to this question is IC 35-1-31-2, Ind. Ann. Stat. Sec. 9-1602 (Burns 1956), which states that rules of evidence for civil cases concerning competency will govern in criminal matters, except where otherwise provided in the criminal code.

One such exception in the criminal code is IC 35-1-31-3, Ind. Ann. Stat. Sec. 9-1603, which states that

"The following persons are competent witnesses:
First, All persons who are competent to testify in civil actions.
Second. The party injured by the offense committed.

\* \* \*"

Finally, IC 1971, 34-1-14-5 (Burns Code Ed.) states, in part, that

"The following persons shall *not* be competent witnesses:

First. Persons insane at the time they are offered as witnesses, whether they have been so adjudged or not.

\* \* \*" (Our emphasis.)

Thus, while Milhous would be competent under Sec. 9-1603, *supra, as* "the party injured" the question is whether Sec. 34-1-14-5 and Milhous' status as a ward disqualify him as a witness.

It is our conclusion that the trial court did not err in finding Milhous a competent witness. We look first to this court's interpretation of Sec. 34-1-14-5 (being Ind. Ann. Stat. Sec. 2-1714), *supra,* in *Hart* v. *Miller* (1902), 29 Ind. App. 222, 247, 64 N.E. 239. The court there stated that

"The words 'whether they have been so adjudcated or not,' in our statute relating to the incompetency of persons as witnesses, refer to the adjudcation in a proceeding to establish unsound mind and procure the appointment of a guardian. Sec. 2714 *et seq.* Burns 1901. If there has been no such investigation and adjudcation, and the person offered be then found by the court to be insane, he is incompetent. . . . The person for whom a guardian is appointed in a statutory inquisition for such purpose is already adjudged to be an insane person within the meaning of the statute concerning witnesses."

The court then held that the guardian could not assert the competency of his ward in an action where his standing was based solely on his status as guardian.

The *Hart* case is not cited by appellants in their brief. However, this is not particularly surprising in light of the fact that it was the appellants who, while alleging a prior adjudication of incompetency, requested that Milhous be examined prior to their trial to determine his mental capacity to testify. Milhous was examined by two psychiatrists, and both testified that he was competent to testify. Appellants neither challenged the experts' conclusions, nor presented evidence to the contrary. Instead, they have waited until after Milhous has testified, and now seize upon inconsistencies in testimony.

It is our conclusion, therefore, that regardless of the effect of the above statutes and *Hart, supra,* in other cases, in the present case Hunter and Shindler cannot complain on appeal of action taken by the trial court based on evidence which resulted only after their request was granted. What would be the result where appellants had merely set up the prior adjudication of incompetency as a bar need not concern us here. In passing, we note that *Hart, supra,* does not stand for the proposition that a ward is absolutely and perpetually incompetent as a witness. One may be relieved of such a disability. *See,* IC 1971, 29-1-18-47 (Burns Code Ed.). We find no abuse of discretion in allowing Milhous to testify.

## V.

We next consider whether it was error for the trial court to admit into evidence a "mug-shot" photograph of appellant Hunter.

At trial, the State called as a witness the jail commander, who testified as to various sign-in procedures for all arrestees. He then identified sign-in card (exhibits 41, 42) which bore the signature of Hunter. During cross examination on this matter, the following exchange occurred:

"Q. Officer, you don't mean to imply that this lady has any criminal record, just because you've brought these signature cards to Court, do you?

A. I don't know what she's on trial here for, sir.

Q. Well, isn't it normal—in fact, it's absolutely essential that in any criminal case, when a person is arrested, whether guilty or innocent, that they are taken to jail and they sign these cards . . .

A. That's correct . . .

Q. . . . and that's the only reason you're here, to show that she signed these cards in this particular case, is that right?

A. Yes."

After the above questioning, the State was permitted to ask omitted questions dealing with the mug-shot. Appellant's

counsel objected to the introduction of the evidence on the ground that there was no issue of identification, and that the State was deliberately attempting to prejudice Hunter.

During argument on this matter, the following transpired:

"Mr. New: We offer in evidence State's Exhibit 43.

Foley: Judge, we have to object. We don't think that's relevant or even necessary. There's no identification matter in this case.

New: We make the offer for the purpose of verifying the signatures as one and the same as the defendant's and for no other reason.

Q. Officer, we hand you State's Exhibit 43 and ask you if that photograph is taken from the same file which you testified State's Exhibits 41 and 42 were taken from?

*    *    *

A. Yes sir, according to the photo number on the card that the lady signed, this is the photograph.

Q. And is that a photograph taken in the usual course of business that is taken of all prisoners that come in to sign into the jail?

A. That's correct.

Q. And that is the same case number and the same file number as Exhibits 41 and 42, and pertain to the same person in the usual course of your entries in the jail?

A. Can I see the book-in card again?

Q. Yes.

A. Yes sir.

Mr. New: We re-offer State's Exhibit 43.

Mr. Foley: Well, we'd again object, Your Honor. Her identification is not an issue.

*    *    *"

Also during this argument, the State offered to withdraw the photograph if Hunter would stipulate that the signatures on the jail cards were actually hers. Hunter, however, refused to stipulate, and the photograph was ultimately admitted.

Numerous cases in this State have established that, generally, when a defendant does not take the stand or other-

wise place his character in issue, "mug-shots" are not properly admissible when they tend to prove or imply that the defendant has a criminal record. *See, Saffold* v. *State* (1974), 162 Ind. App. 6, 317 N.E.2d 814; *Baynard* v. *State* (1972), 259 Ind. 336, 286 N.E.2d 844; *Blue* v. *State* (1968), 249 Ind. 494, 235 N.E.2d 471; *Vaughn* v. *State* (1939), 215 Ind. 142, 19 N.E.2d 239.

If, however, the State can demonstrate that the photo has some substantial evidential value independent of other evidence, and that it is not unduly prejudicial, it may be admissible. *Saffold, supra; Ringham* v. *State* (1974), 261 Ind. 628, 308 N.E.2d 863.

We find the reasoning in the *Saffold* case equally forceful in the case at bar. In that case, the court focused on the independent probative value of the photograph, and upheld admissibility for two additional reasons: (1) that the defense necessitated introduction because of repeated attacks on in-court identifications, and (2) testimony prior to introduction of the picture and the photograph itself made it clear that the photo was not from a prior crime.

We find that the photograph of Hunter did have probative value beyond the testimony of other witnesses. Although Hunter had been identified in court, there was no direct link between her and the signature "Helen H. Hunter" on the jail card. By connecting the photograph with the signature card, both bearing the same file number, the person in court and the signature of Hunter which appeared on numerous crucial pieces of evidence (e.g. checks and the power of attorney) could be related and verified.

Additionally, the photograph was at least in part required because Hunter's counsel refused to stipulate the authenticity of the jail-card signatures. The photo never would have passed before the eyes of the jurors had defense counsel stipulated as suggested by the court and prosecution.

Finally, the prior testimony regarding the jail-cards and their file numbers, made it clear that the items were related only to the present criminal matter. The only writing which appears on the photograph is "Marion Co. Sheriff" and the number "7670." The number was the key link between the exhibits in issue, and it in no way implied a prior arrest or conviction. As the court stated in *Saffold, supra,* at p. 818, the removal of the numbers from the photograph would have ". . . substantially impair(ed) its probative value . . ." Therefore, given the particular facts of this case, we find no error in the admission of the Hunter photograph.

## VI.

The final issue is whether the evidence is sufficent to support a conviction for conspiracy to commit a felony.

Shindler and Hunter contend that the evidence is wholly circumstantial and that it does not prove that they openly conspired together to commit the crime of theft.

Initially, we wish to clarify that

> "Where the sufficiency of circumstantial evidence is in question, we examine it carefully, not for the purpose of finding whether or not it is adequate to overcome very reasonable hypothesis of innocence, but with the view of deciding whether an inference may be reasonably drawn therefrom tending to support the finding of the trial court." *McAfee* v. *State* (1973), 259 Ind. 687, 291 N.E.2d 554, 556.

In *Mattingly* v. *State* (1957), 237 Ind. 326, 145 N.E.2d 650, this court quoted from *Robertson* v. *State* (1952), 231 Ind. 368, 370, 108 N.E.2d 711 in summarizing the elements of the crime of conspiracy.

> "In order to be a conspiracy there must be an intelligent and deliberate agreement to commit the offense charged. It is sufficient if the minds of the parties meet understandingly to bring about an intelligent and deliberate agreement to do the acts and commit the offense, though the agreement is not manifest by any formal words. *Concurrence of senti-*

*ment and co-operative conduct in an unlawful and criminal enterprise are the essential ingredients of criminal conspiracy.* There must be an agreement and there must be evidence to prove the agreement directly, or such a state of facts that an agreement may be legally inferred. Conspiracies cannot be established by a mere suspicion. Evidence of mere relationship or association between the parties does not show a conspiracy." (Our emphasis.)

*See, also, Graves* v. *State* (1972), 153 Ind. App. 532, 288 N.E.2d 189; *Lane* v. *State* (1972), 259 Ind. 468, 288 N.E.2d 258; *Shelton* v. *State* (1972), 259 Ind. 559, 290 N.E.2d 47. The above quotation is but an elaboration of the statute, *supra,* which states that there is a conspiracy when persons "unite or combine" for the "purpose of committing a felony."

After a thorough review of the evidence set forth above, we find the evidence sufficient to sustain the convictions of Hunter and Shindler.

While we do not deem it necessary to restate the above evidence, we will elaborate on several important particulars.

First, Hunter used a power of attorney to secure Milhous' funds, and to write checks on Milhous' accounts. This power came to Hunter only after Shindler had procured the same from Milhous. Shindler at once transferred the document to Hunter, and he subsequently reaped substantial benefits from this arrangement.

Second, both appellants were instrumental in moving Milhous about and registering him under assumed names. We believe a fair inference from this is that it was done to conceal Milhous and maintain control over him and his assets.

While more facts may be recounted, reference to the above is sufficient to show co-operation, communication and purpose beyond a "mere relationship or association."

Judgment affirmed.

Robertson, C.J., and Lybrook, J., concur.

NOTE.—Reported at 335 N.E.2d 638.