**NORTHSIDE SANITARY LANDFILL, INC., and Jonathan W. Bankert, Appellants,**

v.

**C. Harvey BRADLEY, Jr., Mary J. Bradley, Fidelity and Deposit Company of Maryland and VideoIndiana, Inc., c/b/a WTHR-Channel 13, Appellees.**

No. 1-184A15.

Court of Appeals of Indiana, First District.

May 7, 1984.

Richard W. Cardwell, Ober, Symmes, Cardwell, Voyles & Zahn, Robert A. Claycombe, Kothe, Claycombe & Kortepeter, Indianapolis, for appellants.

Warren D. Krebs, Parr, Richey, Obremskey & Morton, Indianapolis, Terry E. Harris, Young, Harris & Harvey, Crawfordsville, for appellees.

NEAL, Presiding Judge.

### STATEMENT OF THE CASE

Non-party deponent, Hope K. Horning (Horning), appeals an order of the Boone Superior Court directing her to answer two questions upon a discovery deposition.

We affirm.

### STATEMENT OF THE FACTS

By their amended complaint filed on December 20, 1982, plaintiffs Northside Sanitary Landfill, Inc. (Northside) and Jonathan W. Bankert (Bankert) filed their action against C. Harvey Bradley, Jr. and Mary J. Bradley (Bradleys), Fidelity and Deposit Company of Maryland (F & D), and VideoIndiana, Inc., d/b/a WTHR—Channel 13 (Channel 13). The complaint, in four paragraphs, charges the following:

### I. *Northside and Bankert v. Bradleys and F & D.*

In this paragraph, Northside and Bankert claim damages because of an appeal by Bradleys from a decision of the Boone County Board of Zoning Appeals granting a variance permitting expansion of Northside's landfill on to Bankert's property. The trial court granted a temporary injunction pending disposition of the appeal which prevented the use of the expansion area and accepted F & D's injunction bond. Once the appeal was denied, the injunction was dissolved, but Northside and Bankert allege that they incurred damages.

### II. *Northside v. Bradleys.*

This count alleges that Bradleys defamed Northside by disseminating false information accusing Northside of polluting various public bodies between June 6, 1980 and October 7, 1982.

### III. *Northside v. Bradleys and Channel 13.*

In this paragraph, it is alleged that these parties conspired with each other or others, including Citizens Environmental Council (CEC), to defame Northside by accusing it of the violation of state and federal regulations and creating health hazards by pollution.

### IV. *Northside v. Channel 13.*

It is alleged herein that Channel 13 broadcast false information which defamed Northside by accusing it of violating state and federal laws and creating a health hazard. It is alleged that the broadcasts occurred on September 24, 27, 28, 29 and 30, 1982; on October 3, 4, 5, 6, 7, 8, 9, 10, 12, 13, 14, 18 and 20, 1982; November 7, 8, 24, 25, 1982.

Pursuant to subpoena, deposition of Horning was taken by Northside on June 6, 1983. She attended the deposition accompanied by her attorney. Evidence given at the deposition revealed that Horning, who resides in Zionsville in Boone County, possesses a degree from Indiana State University with double majors in political science

and broadcast journalism. Horning is presently attending college part-time seeking a master's degree in health administration. She is an incorporator and member of the board of directors of CEC, a citizens environmental group incorporated in May 1982, whose membership is concerned about the proliferation of hazardous waste. The principal object of CEC was to investigate Northside and a recycling corporation known as EnviroChem, now defunct. Its activities consisted of compiling data about environmental matters and disseminating the information to its members through the use of newsletters and notice of public meetings. Information was gathered from various sources, public as well as private, including the State Board of Health. Horning left the CEC's board of directors in January 1983.

Though she had personal communications with Channel 13, she had no contact with it on behalf of CEC. Her contacts dealt with EnviroChem, not Northside; specifically, the contact involved the possibility of EnviroChem's being named to the super fund. On March 21, 1983, Horning acquired a copy of a Remedial Action Master Plan (RAMP), the EPA clean-up plan, for EnviroChem and then gave it to Tom Cochran of Channel 13. During the deposition, she was asked the following question:

Q. And where did you obtain the plan?

A. A person that has to remain anonymous, occasionally I...

Mr. Claycombe (her attorney): You have said enough.

The question and response was then ordered certified to the court. Although discussion ensued among the lawyers, Horning made no claim of privilege under the Indiana shield law or the Fifth Amendment, nor did she raise the issue of relevancy.

Horning stated that she gave no one else a copy of the clean-up plan, including other media representatives. She and Cochran discussed getting the RAMP to the public by broadcast and other means. She told Cochran that the person who gave her the RAMP would not appear on his television program. The question and answer exchange below followed:

Q. Okay, does this individual work at the State Board of Health?

A. I don't want to answer that.

This question and response was likewise ordered certified to the court. Again, no Fifth Amendment privilege, shield law, or relevancy objection was raised.

On cross-examination, Horning stated she had press credentials from the Zionsville Publications. She does free lance work for the editor of the publications, Carolyn Keating, covering subjects such as P.T.O. or school board meetings if another writer cannot attend. She has not provided Keating with any information or reporting regarding Northside Landfill except:

"Just the reports that I have written up and turned in. They appeared in the Zionsville Publications.

\* \* \* \* \* \*

A news article. The two on-site press conferences were on a Tuesday and she (Carolyn Keating) asked me to do it. She edited and published the stories."

Then finally Horning was asked:

Q. Did you provide her with a copy of the document; the RAMP that you discussed previously?

A. No.

The trial court ordered Horning to answer its two certified questions. On October 26, 1983 she filed a motion to vacate the order solely on the grounds she was not afforded a hearing. Other pleadings filed by Horning on October 31, 1983, mentioned:

"Mrs. Horning would like an opportunity to explain to the court why she didn't answer the questions. Involved are matters of self-incrimination and relevancy."

No mention of the news shield law was made in that pleading. The trial court granted the motion to vacate and set the same for hearing on November 29, 1983. On that date Horning filed an affidavit which, for the first time, claimed that since March 6, 1983, she had been a part-time reporter for the Mainstreet and the Zions-

ville Times. She averred that at the time she obtained the RAMP, she was acting in the course of her employment and part of her copy was.duly published.

At the evidentiary hearing on November 29, Horning explained that she was working free lance and was paid by check on a case by case basis on articles submitted and accepted and no withholding of any form was made. She had received three or four checks totaling $100 to $120. She added that she had only one copy of the RAMP and gave it to Channel 13, where she was not employed in any sense, and had asked them to make her a copy. When she told editor Keating that the RAMP existed, Keating expressed interest and wanted a copy, but Keating later obtained a copy herself. Horning made the RAMP available to her paper only through Channel 13.

Horning stated that she did not raise the shield law issue at the deposition because she was unaware of its existence and had no time to consult counsel. She was asked about any threatened or conceivable criminal prosecutions and refused to answer on the grounds that it would tend to incriminate her. No evidence appears in the record that suggests any criminal violation which would expose her to penalties.

Absent from the record is any evidence as to the contents of the RAMP or the identity of the office that prepared it. The RAMP applies to EnviroChem, and we are not told of any relationship between that corporation and Northside, or why the document defames Northside. The record is silent as to whether the document is secret or a public record. There is nothing to suggest why an environmental clean-up plan based upon public hearing could be secret. At the hearing, Horning's attorney admitted in argument that he did not know during the course of deposition that Horning was a reporter or had press credentials.

## ISSUES

On appeal, Horning asks us to vacate the order requiring her to answer on the basis of:

I. IND.CODE 35-3-5-1, the news shield law.

II. Fifth Amendment guaranties.

III. Relevancy.

## DISCUSSION AND DECISION

### Issue I: Shield Law

The shield law is IND.CODE 34-3-5-1 as follows:

"Newspapers, television and radio stations—Press associations—Employees and representatives—Immunity. —Any person connected with, or any person who has been so connected with or employed by, a newspaper or other periodical issued at regular intervals and having a general circulation, or a recognized press association or wire service, as a bona fide owner, editorial or reportorial employee, who receives or has received income from legitimate gathering, writing, editing and interpretation of news, and any person connected with a licensed radio or television station as owner, official, or as an editorial or reportorial employee who receives or has received income from legitimate gathering, writing, editing and interpretation of news, and any person connected with a licensed radio or television station as owner, official, or as an editorial or reportorial employee who receives or has received income from legitimate gathering, writing, editing, interpreting, announcing or broadcasting of news, shall not be compelled to disclose in any legal proceedings or elsewhere the source of any information procured or *obtained in the course of his employment or representation of such newspaper*, periodical, press association, radio station, television station, or wire service, whether published or not published in the newspaper or periodical, or by the press association or wire service or broadcast or not broadcast by the radio station or television station by which he is employed. [Acts 1941, ch. 44 Sec. 1, p. 128; 1949 ch. 201, Sec. 1, p. 673; 1973, P.L. 319, Sec. 1, p. 1731.]" (Emphasis added).

No attack is made on the validity of the shield law and it is conceded that it is within the power of the legislature to enact such a law. *Branzburg v. Hayes*, (1972) 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626. However, the privilege is personal to the reporter and must be claimed. *Lipps v. State*, (1970) 254 Ind. 141, 258 N.E.2d 622; *Shindler v. State*, (1975) 166 Ind.App. 258, 335 N.E.2d 638. A credible argument is made by Northside that Horning waived her privilege under the shield law by failing to claim it at the deposition. However, we base our decision upon the principal substantive argument made by Northside, which asserts that Horning is not entitled to the protection of the shield law because she did not obtain the RAMP in the course of her employment or representation with the Zionsville Times or Main Street.

When an issue of fact is tried by the court, the court may reconcile, reject, accept and weigh the evidence to determine the credibility of the witness. *Pepka v. Branch*, (1973) 155 Ind.App. 637, 294 N.E.2d 141. The evidence set forth above discloses that Horning, while under oath during the deposition, categorically stated that once she obtained the RAMP, she gave it to Channel 13 with whom she had no employment relationship whatsoever. Further, she did not give the RAMP to any other media representative or for that matter, any other person. She specifically answered that she did not give a copy of RAMP to the Zionsville Publications. Her lawyer's ignorance of her status at the deposition indicates that Horning did not consider that she had reportorial status at that time. Even at the November 29 hearing, her testimony regarding her employment is equivocal. The court could legitimately conclude that Horning did not obtain the RAMP in the course of her employment with Zionsville Publications, but obtained it in furtherance of her personal interest in environmental matters and CEC. The court could infer that since she made the RAMP available to Zionsville Publications only after she had delivered it to Channel 13, and then only upon request, that such act was merely an after thought,

or a means of getting the information to the public, and not in the course of her employment as a reporter. There is no evidence at the November 29, 1983 hearing that Horning either wrote a newspaper article or received any compensation for the RAMP. We find no error under this assignment.

*Issue II: Self-incrimination.*

At the deposition, Horning made no claim as to a Fifth Amendment privilege, and persuasive argument exists that it too is waived. *See Rogers v. United States*, (1951) 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344. Nothing specific was advanced at the November 29 hearing to suggest in what way an answer which disclosed the informant's identity and employment would expose Horning to penal sanctions. On appeal, she asserts that in obtaining the RAMP she potentially violated EPA regulations, 40 C.F.R. Sec. 2.211 (1983). Examination of that regulation reflects that it applies only to "EPA officers and employees who have custody or possession of business information". Willful violation of the section may result in criminal prosecution under 18 U.S.C., Sec. 1905, or other applicable statute. That section applies only to "... an officer or employee of the United States [who] divulges unauthorized material...". We do not know from the record what government office, if any, possessed the RAMP, or whether the RAMP is unauthorized material.

Horning cites *Overman v. State*, (1924) 194 Ind. 483, 143 N.E. 604, which states that the trial court is authorized to determine whether an answer to a question proposed to a witness will incriminate him, but in determining whether the answer might so incriminate a witness, the court is bound by the statement of the witness as to its effect unless it clearly appears from the examination and the circumstances before the court that the witness is mistaken in his conclusion that the answer will incriminate him, or that the witness' refusal is purely contumacious. *Overman, supra,*

at 491, 143 N.E. 604. A witness is excused from answering if the answer would tend to furnish one link in the chain of evidence necessary to convict him of a criminal charge. *Id.* at 487, 143 N.E. 604. The witness is not under any obligation to explain how the answer might tend to incriminate him as this would defeat the very object of the constitutional provision. *Id.* at 490, 143 N.E. 604.

 However, a witness is not exonerated from answering because he judges that in doing so, he would incriminate himself; that is, "his say-so does not of itself establish the hazard of incrimination". *Hoffman v. United States,* (1950) 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118. The trial judge in appraising the claim "must be governed as much by his personal perception of perculiarities of the case as by the facts actually in evidence". *Hoffman, supra,* at 487, 71 S.Ct. at 818 (citation omitted).

 The criminal penalties to which Horning may be exposed, as suggested in her brief, are not applicable, for she is not an officer or employee of the EPA or of the United States, nor is there any showing that the RAMP was unauthorized material. No act, at least on the record of this case, occurs to us, nor, evidently, to the trial court, which exposed her to prosecution. The trial court was within the bounds of its powers in ordering Horning to answer.

*Issue III: Relevancy*

 Northside's argument that a witness, discovery or otherwise, does not have standing to raise the question of relevancy is not well taken. Ind.Rules of Procedure, Trial Rule 26(C), provides that a person from whom discovery is sought may seek an order to protect them from annoyance, embarrassment, oppression, or undue burden or expense. This rule confers standing. Though no pleading designated as a motion for protective order was filed, proceedings were had for that purpose.

Ind.Rules of Procedure, Trial Rule 26(B)(1), permits discovery of the identity of persons having knowledge or information leading to discovery of admissible evidence. Discovery is limited only by relevancy. 2 W. Harvey, *Indiana Practice,* Sec. 26.2 at 470 (1970). Horning argues that the RAMP was a plan to clean up a defunct waste recycling corporation called EnviroChem and therefore had nothing to do with Northside. Northside responds that discovery of the anonymous person's identity regarding RAMP will likely lead to the discovery of admissible evidence, since Horning was a director of CEC which is alleged to be a part of the conspiracy. It further asserts that the RAMP, although it is about EnviroChem, contains defamatory language concerning plaintiff Jonathan W. Bankert, and therefore the identity of the informant is relevant.

 Relevancy and discovery are questions addressed to the sound discretion of the trial court. *Justak v. Bochnowski,* (1979) 181 Ind.App. 439, 391 N.E.2d 872; *Johnson v. State,* (1983) Ind., 446 N.E.2d 1307. We perceive that an amended complaint filed December 20, 1982, alleging defamation occurring in the fall of 1982, could hardly be based upon a document which first was acquired and disclosed by Horning on March 21, 1983. Nevertheless, the same source that leaked the RAMP to Horning could well have leaked it to someone else, such as CEC, Channel 13, or the Bradleys, thus constituting evidence to form a link in the conspiracy. We are not able to say that the trial court abused its discretion in ordering discovery.

For the above reasons, this cause is affirmed.

Judgment affirmed.

ROBERTSON and RATLIFF, JJ., concur.