# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 29 2017, 10:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

---

ATTORNEY FOR APPELLANT

David W. Stone, IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

---

## IN THE
# COURT OF APPEALS OF INDIANA

---

Kraig Von Reese Brown,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 29, 2017

Court of Appeals Case No.
48A04-1606-CR-1368

Appeal from the Madison Circuit Court

The Honorable Mark Dudley, Jr., Judge

Trial Court Cause No.
48C06-1401-FB-147

**Vaidik, Chief Judge.**

# Case Summary

At Kraig Brown's trial for dealing in cocaine, a person who was in jail with Brown at the time was called to testify on Brown's behalf. Under the advice of counsel and with the trial court's approval, the witness invoked his Fifth Amendment privilege against self-incrimination. The jury convicted Brown. Brown now appeals, arguing that the trial court erred when it accepted the witness's invocation of the privilege against self-incrimination and that, in any event, the evidence is insufficient to support his conviction. Finding no error and that there is sufficient evidence, we affirm.

# Facts and Procedural History

On April 21, 2011, Jerrett Scott purchased cocaine and was later arrested for possession of cocaine by the Madison County Drug Task Force. In lieu of pressing charges, the Drug Task Force offered Scott a deal to work as a Confidential Informant (CI). The CI provided the Drug Task Force with Brown's name and phone number and referred to Brown by his street name, "Manman." Tr. p. 308. The CI stated that Brown was the dealer who had sold to him earlier that day. The Drug Task Force had the CI call Brown to set up another buy.

Before conducting a "controlled buy," Drug Task Force officers conduct a pre-buy interview—they search the CI for any drugs, money, or weapons and explain the buying process. After the buy is completed, Drug Task Force

officers conduct a post-buy interview—they search the CI for any additional drugs, money, or weapons and ask questions about the buy. On April 21, Drug Task Force Officer Mark Naselroad conducted the CI's pre-buy and post-buy interviews and provided him with funds to purchase cocaine from Brown. During the buy, Drug Task Force officers lost sight of the CI and did not see Brown at the buy location. After purchasing the drugs, the CI immediately returned to Officer Naselroad's undercover car and went through the post-buy interview.

[4] The CI performed similar buys for the Drug Task Force on May 5 and May 18, going through the pre-buy and post-buy processes for each transaction with Officer Naselroad. At the May 5 buy, the CI met with Brown at a Motel 6. Officer Naselroad was positioned roughly one block from the motel and could not see the drug deal. Drug Task Force Officer Shaun Williams, however, provided additional surveillance from an undercover car parked in the motel's parking lot. Officer Williams witnessed the CI walk into room 206 and exit the room a short time later. He watched the CI proceed directly from the motel room to Officer Naselroad's car. The CI then gave Officer Naselroad the drugs he had just purchased. Officer Williams remained at the motel for a few minutes after the CI left and witnessed Brown also exit room 206.[1]

---

[1] Brown maintains that Officer Williams testified that Brown came out of room 212 and not room 206. Appellant's Br. pp. 14-15. Officer Williams testified that he witnessed an unidentified man walk through the motel's parking lot and enter room 212. The man later opened his motel room door and stared at Officer Williams, who was still in his car. The unidentified man walked back into room 212 and was not seen again, nor was he present in the courtroom. *See* Tr. pp. 329-30. After Officer Williams testified that he saw Brown

[5] At the May 18 buy, the CI met with Brown in a parking lot. The CI entered a van and exited a few minutes later. He proceeded directly from the van to Officer Naselroad's undercover car and handed over the drugs he had just purchased. Drug Task Force officers conducting surveillance on the buy did not see Brown. After the buy, two officers followed the van and witnessed a male and female exit the van. The officers were not able to identify either individual.

[6] After completing the third buy on May 18, Officer Naselroad presented the CI with a photo array of pictures of six different individuals, including Brown. Officer Naselroad asked the CI if the man who sold him drugs on April 21, May 5, and May 18 was in the photo array. The CI identified Brown as the dealer on all three dates, circled Brown's picture, and placed his initials next to Brown's photo. State's Ex. 7. Brown was later arrested and charged with three felony counts of dealing in cocaine. Brown was housed in the Madison County Jail while awaiting his trial.

[7] Before the start of Brown's jury trial, the CI was transferred from the Department of Correction to the Madison County Jail. At the first day of trial, the CI testified that he knew Brown, referred to Brown as Manman, and identified Brown in the courtroom. The CI further stated that Brown was the

and the CI leave room 206, the State asked, "Did you see anybody else come out of room 212?" *Id.* at 332. Officer Williams did not correct the prosecutor and answered, "[A]fter the CI came out I sat there like I said for approximately five (5) minutes or so before I observed Mr. Brown come out of the room." *Id.* at 332-33. Read in context, it is clear that Officer Williams was testifying that Brown exited room 206 and not 212.

individual who had sold him cocaine on April 21, May 5, and May 18. He also

confirmed that he had identified Brown in the photo array provided to him by

Officer Naselroad.

[8]     At the start of the second day of the trial, Brown presented his attorney with a

handwritten note from Howard Jones, another inmate at the Madison County

Jail. The note stated:

> When [the CI] came into E-Block he told me he had been
> incarcerated for 5 years (since 2010/2011). He also said he
> didn't know you but you looked familiar, thinking he'd shot dice
> with you before. He spoke to me about how the detectives had
> brought him to MCJ to possibly testify against someone. He
> stated that when he was called by the detectives he would tell
> them to "Eat sh*t." Once he came back from questioning he
> talked about possibly modifying or having his sentence amended
> for an early release. I'm not sure if he really is from Anderson or
> Michigan like he told me. After he was called down to sign some
> papers on 3-21-16, he got on the phone and told the recipient he
> would be getting out within 2 to 6 months. I believe he cut a deal
> for early release to testify against you.

Def. Ex. A (tendered during offer of proof but not admitted). Defense counsel

alerted the trial court to the existence of the note and requested that Jones be

called as a witness. Outside the presence of the jury, Jones was deposed and

answered questions from both defense counsel and the State. Jones stated that

he wrote the note for Brown, who he referred to as Manman. He wrote the

note because, after his purported conversation with the CI, he talked to an

inmate named "Sticky" (Jones did not know Sticky's real name), who told

Jones that the CI was there to testify against Brown. Jones then got ahold of

Brown and told him about his alleged conversation with the CI and wrote the note for Brown to give to his attorney. *See* Tr. pp. 419-20, 424-26, 435-37.

[9] The jury reconvened in the courtroom, and defense counsel recalled the CI to testify. The CI denied ever speaking with anyone about Brown's case or saying that he did not recognize Brown. The CI stated that he did not know anyone named Howard Jones and had never met with Jones while in the Madison County Jail. He also explained, contrary to Jones's note, that he had actually recognized Brown in the Madison County Jail and, as a result, requested a transfer to a different block to ensure that he and Brown would not cross paths.

[10] Defense counsel then called Jones to testify, but before he could take the stand an attorney present on his behalf objected:

> I am representing defense's next witness Howard Jones downstairs in two separate criminal causes. One of those causes involves charges substantially similar to this case. Basically a, a drug possession with, with potential intent to distribute. . . . I am instructing him to take the fifth in regard to this case in fear that somehow a door could be opened in which would result [sic] in him being examined with regard to the criminal charges pending against him and his involvement with those charges and our burden is merely to show that there is the risk of that some piece [sic] of testimony being elicited from him that would supply a link in the chain to his future prosecution. . . . [S]o we believe that that is a realistic if not fanciful [sic] based on the charges pending against him that they could probe into drug dealing activity, kidnapping activity revolved around drug dealing type allegations and extortion of another drug dealer.

*Id.* at 495-96.

[11]  Based on Jones's deposition and his attorney's objection, the trial court found that Jones had met his burden to invoke his Fifth Amendment privilege against self-incrimination. Jones responded to defense counsel's first question by saying, "Based upon advice of counsel I respectfully decline to answer your questions and assert my Fifth Amendment." *Id.* at 504. He was then dismissed as a witness.

[12]  Later, outside the presence of the jury, defense counsel made an offer of proof that had Jones testified, his testimony would have been consistent with his deposition testimony and the note that he wrote to Brown. The trial court accepted the offer, stating, "Court will also show the offer of proof that if [Jones] had not invoked the Fifth Amendment privilege his testimony would be consistent with [the note] and what he testified to earlier." *Id.* at 513.

[13]  After the conclusion of the trial, the jury returned a verdict of not guilty on counts I and III (the April 21 and May 18 buys), but it found Brown guilty on count II (the May 5 buy). Brown now appeals.

# Discussion and Decision

[14]  Brown argues that the trial court erred when it granted Jones's invocation of his Fifth Amendment privilege against self-incrimination and that the evidence is insufficient to support his conviction for dealing in cocaine on May 5.

# I. Fifth Amendment

The Fifth Amendment to the United States Constitution extends to the States through the Fourteenth Amendment. *Withrow v. Williams*, 507 U.S. 680, 689 (1993). The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This protection not only applies to a criminal defendant in his own trial but also allows any witness "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answer might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). The Fifth Amendment, however, does not create an unqualified privilege for a witness to remain silent. *Salinas v. Texas*, 133 S. Ct. 2174, 2182-83 (2013). "A witness' constitutional right to refuse to answer questions depends on his reason for doing so, and courts need to know those reasons to evaluate the merits of a Fifth Amendment claim." *Id.* at 2183 (citing *Hoffman v. United States*, 341 U.S. 479, 486-87 (1951)). "When confronted with a witness's assertion of Fifth Amendment rights, the trial court must hold a hearing outside the presence of the jury." *Duso v. State*, 866 N.E.2d 321, 325 (Ind. Ct. App. 2007) (citing Ind. Code § 35-37-3-1).

We review a trial court's acceptance of a witness's invocation of the Fifth Amendment privilege against self-incrimination for an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances before it." *Montgomery v. State*, 14 N.E.3d 76, 78 (Ind. Ct. App. 2014). "We do not reweigh the evidence, and

we consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom." *Hale v. State*, 992 N.E.2d 848, 852 (Ind. Ct. App. 2013).

[17] Brown specifically argues that the risk that Jones would be prosecuted based on his testimony is "purely fanciful." Appellant's Br. p. 13. In other words, the court should not have granted Jones's invocation of the self-incrimination privilege because the threat of Jones's testimony being linked to his pending charges is virtually non-existent. This Court set forth in *Duso* the standard for assessing a witness's assertion of the self-incrimination privilege:

> [I]n determining whether the answer might so incriminate the witness, the court is bound by the statement of the witness as to its effect unless it clearly appears from the examination and the circumstances before the court that the witness is mistaken in his conclusion that the answer will incriminate him, or that the witness' refusal is purely contumacious. A witness is excused from answering if the answer would tend to furnish one link in the chain of evidence necessary to convict him of a criminal charge. The witness is not under any obligation to explain how the answer might tend to incriminate him as this would defeat the very object of the constitutional provision.

866 N.E.2d at 325 (quoting *Northside Sanitary Landfill, Inc. v. Bradley*, 462 N.E.2d 1321, 1325 (Ind. Ct. App. 1984)). In appraising the witness's claim, the trial court "must be governed as much by [its] personal perception of peculiarities of the case as by the facts actually in evidence." *Northside Sanitary Landfill*, 462 N.E.2d at 1326.

[18] Here, had Jones testified, the State and defense attorney would have been allowed to inquire into Jones's criminal history, including the charges pending against him. One of Jones's charges was "substantially similar" to Brown's charges for dealing in cocaine. Tr. p. 495; s*ee Duso*, 866 N.E.2d at 325. During his deposition, Jones referred to Brown as Manman, Brown's street name. The State and the defense attorney would have been allowed to inquire into Jones's relationships with both Brown and Sticky, *see* Ind. Evidence Rule 616, which could have opened a door to Jones's pending charges. Based on the testimony Jones provided outside the presence of the jury and the reasons for invoking the Fifth Amendment privilege against self-incrimination, it was not clearly apparent that Jones's attorney was mistaken in his conclusion that his answers could reasonably incriminate him. The trial court did not abuse its discretion when it accepted Jones's invocation of his Fifth Amendment privilege against self-incrimination.[2]

[19] We also agree with the State that even if the trial court had erred when it accepted Jones's invocation of his Fifth Amendment privilege, the error would have been harmless. Error is harmless when, in light of all the evidence in the case, it is sufficiently minor so as not to affect the substantial rights of a party. Ind. Appellate Rule 66(A); *see Lewis v. State*, 34 N.E.3d 240, 248 (Ind. 2015).

---

[2] After the trial court granted Jones's invocation of his Fifth Amendment privilege, Brown's attorney argued that Jones's deposition testimony should be admitted into the record for the jury, but defense counsel did not pursue the issue after the State gave its rebuttal argument for not admitting the deposition. Defense counsel did not seek a ruling from the trial court, no ruling was issued, and this argument was not raised on appeal.

Jones's testimony outside the presence of the jury was that the CI told him that he did not know Brown but they had maybe shot dice together. This testimony, on its face would be hearsay, *see* Ind. Evidence Rule 801, but it could be admitted to impeach the CI, *see* Ind. Evidence Rule 608. In other words, Jones's statement would have been admissible not for its truth but rather to create doubt regarding the truthfulness of the CI's prior testimony that he knew Brown. However, the CI's testimony that he knew Brown was further supported by Officer Naselroad's testimony that the CI identified Brown in a photo array, provided the Drug Task Force with Brown's name and contact information, and knew Brown's street name. Additionally, Officer Williams testified that on May 5 he witnessed Brown exit motel room 206 mere minutes after the CI exited the room. Given the additional evidence to corroborate the CI's testimony that he knew Brown, any error in allowing Jones not to testify would have been harmless.

# II. Sufficiency of the Evidence

[20] Brown further contends that even if the trial court properly allowed Jones to invoke the Fifth Amendment, the evidence is insufficient to support his conviction. When reviewing the sufficiency of the evidence, we neither reweigh the evidence nor determine the credibility of the witnesses; that role is reserved for the factfinder. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012). "The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction." *Id.* A conviction will be affirmed "if there is substantial evidence of probative value supporting each

element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.*

[21] Specifically, Brown argues that "other than the testimony of [the CI] whom the jury did not find credible with respect to the other two buys, there is nothing to uphold the conviction beyond the fact that the defendant was at the motel." Appellant's Br. pp. 14-15. There is sufficient evidence to support the CI's testimony that Brown had sold him cocaine on May 5. Officer Naselroad testified about the pre-buy and post-buy interview process and that he conducted these interviews with the CI on May 5. When the CI left Officer Naselroad's car his only possession was the money the Drug Task Force had provided for him to purchase cocaine. The CI then entered room 206, as stated by Officer Williams, and left a few minutes later. The CI proceeded directly from room 206 to Officer Naselroad's car, and his only possession upon arrival was cocaine. Officer Williams also testified that he witnessed Brown leave room 206 minutes after the CI exited. There is sufficient evidence beyond the CI's testimony to support Brown's conviction for dealing in cocaine on May 5.

[22] Affirmed.

Bradford, J., and Brown, J., concur.